ZENITH RADIO CORP. *v.* UNITED STATES

No. 77–539. Argued April 25, 1978—Decided June 21, 1978

MARSHALL, J., delivered the opinion for a unanimous Court.

*Frederick L. Ikenson* argued the cause for petitioner. With him on the briefs were *Eugene L. Stewart* and *Philip J. Curtis.*

*Solicitor General McCree* argued the cause for the United States. With him on the brief were *Assistant Attorney General Babcock, Deputy Solicitor General Easterbrook, Richard A. Allen, Leonard Schaitman, David M. Cohen,* and *Robert H. Mundheim.*\*

---

*Briefs of *amici curiae* urging affirmance were filed by *Saul L. Sherman* for the American Importers Assn., Inc.; and by *N. David Palmeter* and *David P. Houlihan* for the Union des Industries de la Communauté Europeenne.

Briefs of *amici curiae* were filed by *Marjorie M. Shostak, S. Richard Shostak, Theodore B. Olson,* and *James F. O'Hara* for Craig Corp. et al.; and by *Robert E. Herzstein* for Ford Motor Co.

MR. JUSTICE MARSHALL delivered the opinion of the Court.

Under § 303 (a) of the Tariff Act of 1930, 46 Stat. 687, as amended, 19 U. S. C. § 1303 (a) (1976 ed.), whenever a foreign country pays a "bounty or grant" upon the exportation of a product from that country, the Secretary of the Treasury is required to levy a countervailing duty, "equal to the net amount of such bounty or grant," upon importation of the product into the United States.[1] The issue in this case is whether Japan confers a "bounty" or "grant" on certain consumer electronic products by failing to impose a commodity tax on those products when they are exported, while imposing the tax on the products when they are sold in Japan.

---

[1] Section 303 (a) provides in relevant part:

"(1) Whenever any country, dependency, colony, province, or other political subdivision of government, person, partnership, association, cartel, or corporation, shall pay or bestow, directly or indirectly, any bounty or grant upon the manufacture or production or export of any article or merchandise manufactured or produced in such country, dependency, colony, province, or other political subdivision of government, then upon the importation of such article or merchandise into the United States, whether the same shall be imported directly from the country of production or otherwise, and whether such article or merchandise is imported in the same condition as when exported from the country of production or has been changed in condition by remanufacture or otherwise, there shall be levied and paid, in all such cases, in addition to any duties otherwise imposed, a duty equal to the net amount of such bounty or grant, however the same be paid or bestowed.

. . . .

"(5) The Secretary shall from time to time ascertain and determine, or estimate, the net amount of each such bounty or grant, and shall declare the net amount so determined or estimated.

"(6) The Secretary shall make all regulations he deems necessary for the identification of articles and merchandise subject to duties under this section and for the assessment and collection of such duties. All determinations by the Secretary under this section, and all determinations by the Commission under subsection (b)(1) of this section (whether affirmative or negative) shall be published in the Federal Register." 19 U. S. C. § 1303 (a) (1976 ed.).

I

Under the Commodity Tax Law of Japan, Law No. 48 of 1962, see App. 44–48, a variety of consumer goods, including the electronic products at issue here, are subject to an "indirect" tax—a tax levied on the goods themselves, and computed as a percentage of the manufacturer's sales price rather than the income or wealth of the purchaser or seller. The Japanese tax applies both to products manufactured in Japan and to those imported into Japan.[2] On goods manufactured in Japan, the tax is levied upon shipment from the factory; imported products are taxed when they are withdrawn from the customs warehouse. Only goods destined for consumption in Japan are subject to the tax, however. Products shipped for export are exempt, and any tax paid upon the shipment of a product is refunded if the product is subsequently exported. Thus the tax is "remitted" on exports.[3]

In April 1970 petitioner, an American manufacturer of consumer electronic products, filed a petition with the Commissioner of Customs,[4] requesting assessment of countervailing duties on a number of consumer electronic products exported from Japan to this country.[5] Petitioner alleged that Japan

---

[2] See App. 12–13, 30–31; An Outline of Japanese Taxes 128–129 (Tax Bureau, Japanese Ministry of Finance, 1976). For the products at issue here, the rate of taxation apparently ranges from 15% to 20%. See App. 13–14; An Outline of Japanese Taxes, *supra*, at 131.

[3] For purposes of this opinion, we adopt the convention followed by the parties and use the term "remission" to encompass both the exemption of exports from initial taxation and the refund to the exporter of any taxes already paid.

[4] The Secretary of the Treasury has delegated the authority to make countervailing-duty determinations to the Commissioner of Customs, subject to the Secretary's approval. See 19 CFR § 159.47 (1977).

[5] The products included television receivers, radio receivers, radio-phonograph combinations, radio-television-phonograph combinations, radio-tape-recorder combinations, record players and phonographs complete with amplifiers and speakers, tape recorders, tape players, and color television

had bestowed a "bounty or grant" upon exportation of these products by, *inter alia,* remitting the Japanese Commodity Tax that would have been imposed had the products been sold within Japan. In January 1976, after soliciting the views of interested parties and conducting an investigation pursuant to Treasury Department regulations, see 19 CFR § 159.47 (c) (1977), the Acting Commissioner of Customs published a notice of final determination, rejecting petitioner's request. 41 Fed. Reg. 1298 (1976).[6]

Petitioner then filed suit in the Customs Court, claiming that the Treasury Department had erred in concluding that remission of the Japanese Commodity Tax was not a bounty or grant within the purview of the countervailing-duty statute.[7] The Department defended on the ground that, since the remission of indirect taxes was "nonexcessive," the statute did not require assessment of a countervailing duty. In the Department's terminology, a remission of taxes is "nonexcessive" if it does not exceed the amount of tax paid or otherwise due; thus, for example, if a tax of $5 is levied on goods at the factory, the return of the $5 upon exportation would be "nonexcessive," whereas a payment of $8 from the government to the manufacturer upon exportation would be "excessive" by $3. The Department pointed out that the current

---

picture tubes. See 37 Fed. Reg. 10087, App. A (1972), as amended, 37 Fed. Reg. 11487 (1972).

[6] The notice stated in relevant part that "on the basis of the . . . facts gathered and the investigation conducted pursuant to . . . Customs Regulations . . . a final determination is hereby made . . . that . . . no bounty or grant is being paid or bestowed, directly or indirectly, within the meaning of section 303 . . . upon the . . . exportation of certain consumer electronic products from Japan." 41 Fed. Reg. 1298 (1976).

[7] Suit was filed pursuant to a provision, enacted in 1975, authorizing American manufacturers, producers, and wholesalers to seek review in the Customs Court of administrative decisions not to impose countervailing duties under § 303. Tariff Act of 1930, as amended, § 516 (d), 19 U. S. C. § 1516 (d) (1976 ed.).

version of § 303 is in all relevant respects unchanged from the countervailing-duty statute enacted by Congress in 1897,[8] and that the Secretary—in decisions dating back to 1898—has always taken the position that the nonexcessive remission of an indirect tax is not a bounty or grant within the meaning of the statute.[9]

On cross-motions for summary judgment, the Customs Court ruled in favor of petitioner and ordered the Secretary to assess countervailing duties on all Japanese consumer elec-

---

[8] Section 5 of the Tariff Act of July 24, 1897, 30 Stat. 205, provided in full:

"That whenever any country, dependency, or colony shall pay or bestow, directly or indirectly, any bounty or grant upon the exportation of any article or merchandise from such country, dependency, or colony, and such article or merchandise is dutiable under the provisions of this Act, then upon the importation of any such article or merchandise into the United States, whether the same shall be imported directly from the country of production or otherwise, and whether such article or merchandise is imported in the same condition as when exported from the country of production or has been changed in condition by remanufacture or otherwise, there shall be levied and paid, in all such cases, in addition to the duties otherwise imposed by this Act, an additional duty equal to the net amount of such bounty or grant, however the same be paid or bestowed. The net amount of all such bounties or grants shall be from time to time ascertained, determined, and declared by the Secretary of the Treasury, who shall make all needful regulations for the identification of such articles and merchandise and for the assessment and collection of such additional duties."

The current version of § 303 represents the fifth re-enactment of the 1897 provision without any changes relevant here. Tariff Act of 1909, § 6, 36 Stat. 85; Tariff Act of 1913, § IV (E), 38 Stat. 193; Tariff Act of 1922, § 303, 42 Stat. 935; Tariff Act of 1930, § 303, 46 Stat. 687; Trade Act of 1974, § 331 (a), 88 Stat. 2049.

[9] There is no dispute here regarding either the nonexcessive nature of the remission or the indirect nature of the tax. Moreover, although the Department did not so state in the notice of final determination, see n. 6, *supra*, petitioner does not dispute that the Department's decision in this case was based on its longstanding position that the nonexcessive remission of an indirect tax is not a bounty or grant.

tronic products specified in petitioner's complaint. 430 F. Supp. 242 (1977). The court acknowledged the Secretary's longstanding interpretation of the statute. It concluded, however, that this administrative practice could not be sustained in light of this Court's decision in *Downs* v. *United States,* 187 U. S. 496 (1903), which held that an export bounty had been conferred by a complicated Russian scheme for the regulation of sugar production and sale, involving, among other elements, remission of excise taxes in the event of exportation.

On appeal by the Government, the Court of Customs and Patent Appeals, dividing 3–2, reversed the judgment of the Customs Court and remanded for entry of summary judgment in favor of the United States. 64 C. C. P. A. 130, 562 F. 2d 1209 (1977). The majority opinion distinguished *Downs* on the ground that it did not decide the question of whether non-excessive remission of an indirect tax, standing alone, constitutes a bounty or grant upon exportation. The court then examined the language of § 303 and the legislative history of the 1897 provision and concluded that, "in determining whether a bounty or grant has been conferred, it is the economic result of the foreign government's action which controls." 64 C. C. P. A., at 138–139, 562 F. 2d, at 1216. Relying primarily on the "long-continued" and "uniform" administrative practice, *id.,* at 142–143, 146–147, 562 F. 2d, at 1218–1219, 1222–1223, and secondarily on congressional "acquiescence" in this practice through repeated re-enactment of the controlling statutory language, *id.,* at 143–144, 562 F. 2d, at 1220, the court held that interpretation of "bounty or grant" so as not to include a nonexcessive remission of an indirect tax is "a lawfully permissible interpretation of § 303." *Id.,* at 147, 562 F. 2d, at 1223.

We granted certiorari, 434 U. S. 1060 (1978), and we now affirm.

450

## II

It is undisputed that the Treasury Department adopted the statutory interpretation at issue here less than a year after passage of the basic countervailing-duty statute in 1897, see T. D. 19321, 1 Synopsis of [Treasury] Decisions 696 (1898), and that the Department has uniformly maintained this position for over 80 years.[10] This longstanding and consistent administrative interpretation is entitled to considerable weight.

"When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. 'To sustain [an agency's] application of [a] statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings.'" *Udall* v. *Tallman*, 380 U. S. 1, 16 (1965), quoting *Unemployment Compensation Comm'n* v. *Aragon*, 329 U. S. 143, 153 (1946).

Moreover, an administrative "practice has peculiar weight when it involves a contemporaneous construction of a statute by the [persons] charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new." *Norwegian Nitrogen Products Co.* v. *United States,* 288 U. S. 294, 315 (1933); see, *e. g., Power Reactor Co.* v. *Electricians,* 367 U. S. 396, 408 (1961).

The question is thus whether, in light of the normal aids to statutory construction, the Department's interpretation is "sufficiently reasonable" to be accepted by a reviewing court. *Train* v. *Natural Resources Defense Council,* 421 U. S. 60,

---

[10] See, *e. g.,* T. D. 19729, 2 Synopsis of Decisions 157 (1898); T. D. 20039, 2 Synopsis of Decisions 534 (1898); T. D. 43634, 56 Treas. Dec. 342 (1929); T. D. 49355, 73 Treas. Dec. 107 (1938).

75 (1975). Our examination of the language, the legislative history, and the overall purpose of the 1897 provision persuades us that the Department's initial construction of the statute was far from unreasonable; and we are unable to find anything in the events subsequent to that time that convinces us that the Department was required to abandon this interpretation.

## A

The language of the 1897 statute evolved out of two earlier countervailing-duty provisions that had been applicable only to sugar imports. The first provision was enacted in 1890, apparently for the purpose of protecting domestic sugar refiners from unfair foreign competition; it provided for a fixed countervailing duty on refined sugar imported from countries that "pay, directly or indirectly, a [greater] bounty on the exportation of" refined sugar than on raw sugar. Tariff Act of 1890, ¶ 237, 26 Stat. 584. Although the congressional debates did not focus sharply on the meaning of the word "bounty," what evidence there is suggests that the term was not intended to encompass the nonexcessive remission of an indirect tax. Thus, one strong supporter of increased protection for American sugar producers heavily criticized the export "bounties" conferred by several European governments, and attached a concise description of "The Bounty Systems in Europe"; both the remarks and the description indicated that the "bounties" consisted of the amounts by which government payments exceeded the excise taxes that had been paid upon the beets from which the sugar was produced. See 21 Cong. Rec. 9529, 9532 (1890) (remarks of Sen. Gibson); id., at 9537 (description). According to the description, for example, French sugar manufacturers paid an "excise tax [of] $97.06 per gross ton[,] [b]ut upon the export of a ton of sugar ... received back as a drawback $117.60, making a clear bounty of $20.54 per gross ton of sugar exported." Ibid.

This concept of a "net" bounty—that is, a remission in excess of taxes paid or otherwise due—as the trigger for a countervailing-duty requirement emerged more clearly in the second sugar provision, enacted in 1894. Tariff Act of 1894, ¶ 182½, 28 Stat. 521. The 1894 statute extended the countervailing-duty requirement to all imported sugar, raw as well as refined, and provided for payment of a fixed duty on all sugar coming from a country which "pays, directly or indirectly, a bounty on the export thereof." A proviso to the statute made clear, however, that no duties were to be assessed in the event that the "bounty" did not exceed the amount of taxes already paid.[11] The author of the 1894 provision, Senator Jones, expressly characterized this difference between the amounts received upon exportation and the amounts already paid in taxes as the "net bounty" on exportation. 26 Cong. Rec. 5705 (1894) (discussing German export bounty system).

The 1897 statute greatly expanded upon the coverage of the 1894 provision by making the countervailing-duty requirement applicable to all imported products. Tariff Act of 1897, § 5, 30 Stat. 205, quoted in n. 8, *supra*. There are strong indications, however, that Congress intended to retain the "net bounty" concept of the 1894 provision as the criterion for determining when a countervailing duty was to be imposed. Although the proviso in the 1894 law was deleted, the 1897 statute did provide for levying of duties equal to the "net amount" of any export bounty or grant. And the legislative

---

[11] The proviso specified that

"the importer of sugar produced in a foreign country, the Government of which grants such direct or indirect bounties, may be relieved from this additional duty under such regulations as the Secretary of the Treasury may prescribe, in case said importer produces a certificate of said Government that *no indirect bounty has been received upon said sugar in excess of the tax collected upon the beet or cane from which it was produced,* and that no direct bounty has been or shall be paid . . . ." 28 Stat. 521 (emphasis added).

history suggests that this language, in addition to establishing a responsive mechanism for determining the appropriate amount of countervailing duty, was intended to incorporate the prior rule that nonexcessive remission of indirect taxes would not trigger the countervailing-duty requirement at all.

There is no question that the prior rule was carried forward in the version of the 1897 statute that originally passed the House. This version did not extend the countervailing-duty requirement to all imports. Instead, it merely modified the 1894 sugar provision so that the amount of the countervailing duty, rather than being fixed, would be "equal to [the export] bounty, or so much thereof as may be in excess of any tax collected by [the foreign] country upon [the] exported [sugar], or upon the beet or cane from which it was produced . . . ." See 30 Cong. Rec. 1634 (1897). The House Report unequivocally stated that the countervailing duty was intended to be "equivalent to the *net export bounty* paid by any country." H. R. Rep. No. 1, 55th Cong., 1st Sess., 4–5 (1897) (emphasis supplied).

The Senate deleted the House provision from the bill and replaced it with the more general provision that was eventually enacted into law. See 30 Cong. Rec. 1733 (1897) (striking House provision); *id.*, at 2226 (adopting general provision); *id.*, at 2705, 2750 (House agreement to Senate amendment). The debates in the Senate indicate, however, that—aside from extending the coverage of the House provision—the Senate did not intend to change its substance. Senator Allison, the sponsor of the Senate amendment, explained that the House provision was being "stricken from the bill," because "the same paragraph in substance [is] being inserted [in] section [5], making this countervailing duty apply to all articles instead of to [sugar] alone." *Id.*, at 1635. See also *id.*, at 1732 (remarks of Sen. White). Senator Allison twice remarked that the countervailing duty that he was proposing was an "imitation" of the one provided in the 1894 statute,

*id.,* at 1719; see *id.,* at 1674, and later in the debates he stated—in response to a question as to whether the countervailing duty would be equal to "the whole amount of the export bounty"—that "[the bounty contemplated] is the net bounty, less the taxes and reductions . . . ," *id.,* at 1721 (answering question from Sen. Vest).

An additional indication of the Senate's intent can be found in the extended discussion of the effect that the statute would have with respect to German sugar exports. Time after time the amount of the German "bounty"—and, correspondingly, the amount of the countervailing duty that would be imposed under the statute—was stated to be 38¢ per 100 pounds of refined sugar, and 27¢ per 100 pounds of raw sugar. See, *e. g., id.,* at 1650 (remarks of Sens. Allison, Vest, and Caffery), 1658 (Sens. Allison and Jones), 1680 (Sen. Jones), 1719 (Sens. Allison and Lindsay), 1729 (Sen. Caffery), 2823–2824 (Sens. Aldrich and Jones). These figures were supplied by the Treasury Department itself, see *id.,* at 1719 (remarks of Sen. Allison), 1722 (letter from Treasury Department to Sen. Caffery), and were utilized by both proponents and opponents of the measure. And yet it was frequently acknowledged during the debates that Germany exempted sugar exports from its domestic consumption tax of $2.16 per 100 pounds, an amount far in excess of the 38¢ and 27¢ figures. See, *e. g., id.,* at 1646 (remarks of Sen. Vest), 1651 (Sen. Caffery), 1697 (same), 2205 (same). Had the Senators considered the mere remission of an indirect tax to be a "bounty," it seems unlikely that they would have stated that the German "bounties" were only 38¢ and 27¢ per 100 pounds.[12] Especially in

---

[12] The figures of 38¢ and 27¢ per 100 pounds apparently represented the amount of direct bounty paid upon exportation. See, *e. g.,* 30 Cong. Rec. 1722 (1897) (letter from Treasury Department).

Petitioner argues that the Senate must have intended the term "bounty" to include nonexcessive remissions of indirect taxes, since Germany collected a tax on the output of sugar factories that was not remitted upon exporta-

light of the strong opposition to countervailing duties even of the magnitude of 38¢ and 27¢, see, *e. g.*, *id.*, at 1719 (remarks of Sen. Lindsay), 2203–2205 (remarks of Sen. Gray), it seems reasonable to infer that Congress did not intend to impose countervailing duties of many times this magnitude.

## B

Regardless of whether this legislative history absolutely compelled the Secretary to interpret "bounty or grant" so as not to encompass any nonexcessive remission of an indirect tax, there can be no doubt that such a construction was reasonable in light of the statutory purpose. Cf. *Mourning* v. *Family Publications Service, Inc.*, 411 U. S. 356, 374 (1973). This purpose is relatively clear from the face of the statute and is confirmed by the congressional debates: The counter-

---

tion and yet was not subtracted from the figures of 38¢ and 27¢ cited as the "bounties" paid by Germany. The sole evidence cited by petitioner to show that Germany in fact collected such a tax is an exhibit to the testimony of a single witness during hearings conducted *by the House* in 1896. See Tariff Hearings before the House Committee on Ways and Means, 54th Cong., 2d Sess., 617–618 (1896–1897). We have been unable to find any references to this tax anywhere in the Senate debates; moreover, to the extent that anyone contemplated the existence of German taxes that were not remitted upon exportation, the assumption appears to have been that they would be deducted from the 38¢ and 27¢ figures in determining the net amount of the bounty to be countervailed. The following exchange between Senators Allison and Vest is illustrative:

"Mr. VEST. What . . . is the amount of export bounty, taking out taxes, etc., granted by Germany?

"Mr. ALLISON. . . . Of course it can not exceed three-eighths of a cent a pound—thirty-eight one-hundredths on refined sugar—nor can it exceed twenty-seven one-hundredths upon raw sugar. But it may be very much less." 30 Cong. Rec. 1721 (1897).

We note in any event that the amount of the tax cited by petitioner was less than 2¢ per 100 pounds, see Tariff Hearings, *supra,* at 617, whereas the consumption tax—which concededly was remitted upon exportation and yet not added to the figures of 38¢ and 27¢—was in the vicinity of $2.16 per 100 pounds.

vailing duty was intended to offset the unfair competitive advantage that foreign producers would otherwise enjoy from export subsidies paid by their governments. See, *e. g.,* 30 Cong. Rec. 1674 (remarks of Sen. Allison), 2205 (Sen. Caffery), 2225 (Sen. Lindsay) (1897). The Treasury Department was well positioned to establish rules of decision that would accurately carry out this purpose, particularly since it had contributed the very figures relied upon by Congress in enacting the statute. See *Zuber* v. *Allen,* 396 U. S. 168, 192 (1969).

In deciding in 1898 that a nonexcessive remission of indirect taxes did not result in the type of competitive advantage that Congress intended to counteract, the Department was clearly acting in accordance with the shared assumptions of the day as to the fairness and economic effect of that practice. The theory underlying the Department's position was that a foreign country's remission of indirect taxes did not constitute subsidization of that country's exports. Rather, such remission was viewed as a reasonable measure for avoiding double taxation of exports—once by the foreign country and once upon sale in this country. As explained in a recent study prepared by the Department for the Senate Committee on Finance:

> "[The Department's construction was] based on the principle that, since exports are not consumed in the country of production, they should not be subject to consumption taxes in that country. The theory has been that the application of countervailing duties to the rebate of consumption [and other indirect] taxes would have the effect of double taxation of the product, since the United States would not only impose its own indirect taxes, such as Federal and state excise taxes and state and local sales taxes, but would also collect, through the use of the countervailing duty, the indirect tax imposed by the

exporting country on domestically consumed goods."
Senate Committee on Finance, Executive Branch GATT
Studies, 93d Cong., 2d Sess., 17–18 (1974).

This intuitively appealing principle regarding double taxation
had been widely accepted both in this country and abroad for
many years prior to enactment of the 1897 statute. See, *e. g.*,
Act of July 4, 1789, § 3, 1 Stat. 26 (remission of import duties
upon exportation of products) ; 4 Works and Correspondence
of D. Ricardo 216–217 (pamphlets and papers first published
in 1822) ; A. Smith, An Inquiry Into the Nature and Causes
of the Wealth of Nations, Book Four, ch. IV (1776).

## C

The Secretary's interpretation of the countervailing-duty
statute is as permissible today as it was in 1898. The statute
has been re-enacted five times by Congress without any modi-
fication of the relevant language, see n. 8, *supra,* and, whether
or not Congress can be said to have "acquiesced" in the admin-
istrative practice, it certainly has not acted to change it. At
the same time, the Secretary's position has been incorporated
into the General Agreement on Tariffs and Trade (GATT),[13]
which is followed by every major trading nation in the world;
foreign tax systems as well as private expectations thus have
been built on the assumption that countervailing duties would
not be imposed on nonexcessive remissions of indirect taxes.
In light of these substantial reliance interests, the longstand-
ing administrative construction of the statute should "not be

---

[13] Article VI (3) of the GATT, adopted in 1947, 61 Stat. A24, provides
that "[n]o product . . . imported into the territory of any other contract-
ing party shall be subject to . . . countervailing duty by reason of the
exemption of such product from . . . taxes borne by the like product when
destined for consumption in the country of origin or exportation, or by
reason of the refund of such . . . taxes." The Government does not
contend that the GATT provision would supersede § 303 in the event of
conflict between the two. Brief for United States 19 n. 11.

disturbed except for cogent reasons." *McLaren* v. *Fleischer,* 256 U. S. 477, 481 (1921); see *Udall* v. *Tallman,* 380 U. S., at 18.

Aside from the contention, discussed in Part III, *infra,* that the Department's construction is inconsistent with this Court's decisions, petitioner's sole argument is that the Department's position is premised on false economic assumptions that should be rejected by the courts. In particular, petitioner points to "modern" economic theory suggesting that remission of indirect taxes may create an incentive to export in some circumstances, and to recent criticism of the GATT rules as favoring producers in countries that rely more heavily on indirect than on direct taxes.[14] But, even assuming that these arguments are at all relevant in view of the legislative history of the 1897 provision and the longstanding administrative construction of the statute, they do not demonstrate the unreasonableness of the Secretary's current position. Even "modern" economists do not agree on the ultimate economic effect of remitting indirect taxes, and—given the present state of economic knowledge—it may be difficult, if not impossible, to measure the precise effect in any particular case. See, *e. g.,* Executive Branch GATT Studies, *supra,* at 13–14, 17; Marks & Malmgren, Negotiating Nontariff Distortions to Trade, 7 L. & Policy in Int'l Bus. 351 (1975). More fundamentally, as the Senate Committee with responsibility in this

---

[14] See, *e. g.,* Marks & Malmgren, Negotiating Nontariff Distortions to Trade, 7 L. & Policy in Int'l Bus. 327, 351–355 (1975); The United States Submission on Border Tax Adjustments to Working Party No. 4 of the Council on Border Tax Adjustments, Organisation for Economic Co-operation and Development (1966), reprinted in App. 93–116; Paper Submitted by John R. Petty, Assn't Sec'y of the Treasury, Twenty-First Annual Conference of the Canadian Tax Foundation (1968), reprinted in App. 117–138. Both the Secretary and GATT apparently consider remissions of direct taxes (*e. g.,* income taxes) to be countervailable export subsidies. See Brief for United States 18 n. 10, 37–38; GATT, Basic Instruments and Selected Documents 186–187 (Supp. 1961).

area recently stated, "the issues involved in applying the countervailing duty law are complex, and . . . internationally, there is [a] lack of any satisfactory agreement on what constitutes a fair, as opposed to an 'unfair,' subsidy." S. Rep. No. 93–1298, p. 183 (1974). In this situation, it is not the task of the judiciary to substitute its views as to fairness and economic effect for those of the Secretary.

## III

Notwithstanding all of the foregoing considerations, this would be a very different case if, as petitioner contends, the Secretary's practice were contrary to this Court's decision in *Downs* v. *United States*, 187 U. S. 496 (1903).[15] Upon close examination of the admittedly opaque opinion in that case, however, we do not believe that *Downs* is controlling on the question presented here.

The Russian sugar laws at issue in *Downs* were, as the Court noted, "very complicated." *Id.*, at 502. Much of the Court's opinion was devoted to an exposition of these provisions, see *id.*, at 502–512, but for present purposes only two features are relevant: (1) excise taxes imposed on sugar sales within Russia were remitted on exports; and (2) the exporter received, in addition, a certificate entitling its bearer to sell an amount of sugar in Russia, equal to the quantity exported, without paying the full excise tax otherwise due. This certificate was transferable and had a substantial market value related to the amount of tax forgiveness that it carried with it.

---

[15] Petitioner also relies on language in *G. S. Nicholas & Co.* v. *United States*, 249 U. S. 34 (1919), suggesting that the countervailing-duty statute was intended to be read broadly. See *id.*, at 39–41. As petitioner concedes, however, the only question before the Court in that case was whether a direct bounty on exportation of liquor from Great Britain was a "bounty or grant" within the meaning of the statute, see Brief for Petitioner 16–17, and the Court did not address the question of whether nonexcessive remission of an indirect tax fell within the statute.

The Secretary, following the same interpretation of the statute that he followed here, imposed a countervailing duty based on the value of the certificates alone, and not on the excise taxes remitted on the exports themselves.[16] Downs, the importer, sought review, claiming that the Russian system did not confer any countervailable bounty or grant within the meaning of the 1897 statute. He did not otherwise challenge the amount of the duty assessed by the Secretary.[17]

The issue as it came before this Court, therefore, was whether a nonexcessive remission of an indirect tax, together with the granting of an additional benefit represented by the value of the certificate, constituted a "bounty or grant." Since the amount of the bounty was not in question, neither the parties nor this Court focused carefully on the distinction between remission of the excise tax and conferral of the certificate. Petitioner argues, however, that certain broad language in the Court's opinion suggests that mere remission of a tax, even if nonexcessive, must be considered a bounty or grant within the meaning of the statute. Petitioner relies in particular on the following language:

> "The details of this elaborate procedure for the production, sale, taxation and exportation of Russian sugar are of much less importance than the two facts which appear clearly through this maze of regulations, viz.: that no sugar is permitted to be sold in Russia that does not pay an excise tax of R. 1.75 per pood, and that sugar exported pays no tax at all. . . . When a tax is imposed

---

[16] See Memorandum from the Secretary of the Treasury (1901), reprinted in App. 49–51; T. D. 20407, 2 Synopsis of Decisions 996, 997–998 (1898); T. D. 22814, 4 Treas. Dec. 184 (1901); *Downs* v. *United States*, 113 F. 144, 145 (CA4 1902).

[17] In rejecting Downs' claim, both the United States Board of General Appraisers and the Fourth Circuit Court of Appeals identified the "bounty" as residing in the value of the certificates granted upon exportation. See T. D. 22984, 4 Treas. Dec. 405, 410–411, 413 (1901); *Downs* v. *United States, supra,* at 145.

upon all sugar produced, but is remitted upon all sugar exported, then, by whatever process, or in whatever manner, or under whatever name it is disguised, it is a bounty upon exportation." *Id.,* at 515.

This passage is inconsistent with both preceding and subsequent language which suggests that the Court understood the "bounty" to reside in the value of the certificates. At one point the Court stated that "[t]he amount [the exporter] receives for his export certificate [on the market], say, R. 1.25, is the exact amount of the bounty he receives upon exportation . . . ." *Ibid.*[18] And the Court in conclusion specifically endorsed the Fourth Circuit's holding to the same effect, see n. 17, *supra:*

"[T]he Circuit Court of Appeals found: 'That the Russian exporter of sugar obtained from his government a certificate, solely because of such exportation, which is worth in the open market of that country from R. 1.25 to R. 1.64 per pood, or from 1.8 to 2.35 cents per pound. Therefore we hold that the government of Russia does secure to the exporter of that country, as the inevitable result of its action, a money reward or gratuity whenever he exports sugar from Russia.' We all concur in this expression of opinion." 187 U. S., at 516.

Given this other language, we cannot read for its broadest implications the passage on which petitioner relies. In our view the passage does no more than establish the proposition

---

[18] The Court also noted that "[i]t is practically admitted in this case that a bounty equal to the value of [the] certificates is paid by the Russian government, and the main argument of the petitioner is addressed to the proposition that this bounty is paid, not upon exportation, but upon production." 187 U. S., at 512. This latter argument was based on the fact that the 1897 statute covered only bounties on exportation and not those on production. In 1922, Congress amended the statute to cover bounties on production and manufacture as well as exportation. Tariff Act of 1922, *supra,* n. 8.

that an *excessive* remission of taxes—there, the combination of the exemption with the certificates—is an export bounty within the meaning of the statute.

As the court below noted, " '[i]t is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used.' " 64 C. C. P. A., at 134, 562 F. 2d, at 1213, quoting *Cohens* v. *Virginia,* 6 Wheat. 264, 399 (1821). No one argued in *Downs* that a nonexcessive remission of taxes, standing alone, would have constituted a bounty on exportation, and indeed that issue was not presented on the facts of the case. It must also be remembered, of course, that the Court did affirm the Secretary's decision, and that decision rested on the conclusion that a bounty had been paid only to the extent that the remission exceeded the taxes otherwise due. In light of all these circumstances, the isolated statement in *Downs* relied upon by petitioner cannot be dispositive here.

The judgment of the Court of Customs and Patent Appeals is, accordingly,

*Affirmed.*