**SSAB SVENSKT STAAL AB, Plaintiff,**

v.

**UNITED STATES and International Trade Administration, U.S. Department of Commerce, Defendants.**

No. 89–09–00497.

United States Court of International Trade.

May 10, 1991.

Winthrop, Stimson, Putnam & Roberts (Louis H. Kurrelmeyer and Mark A. Monborne at the hearing and on the brief), Barnes, Richardson & Colburn (Andrew P. Vance, of counsel), for plaintiff.

Stewart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice (Vanessa P. Sciarra, at the hearing, M. Martha Ries on the brief), of counsel (Gregory D. Shorin, at the hearing and on the brief), Attorney–Advisor, U.S. Dept. of Commerce, for defendants.

## OPINION AND ORDER

CARMAN, Acting Chief Judge:

Plaintiff ("Svenskt Staal AB" or "SSAB") moves pursuant to Rule 56.1 of the Rules of this Court for judgment on the administrative record of *Final Results of Countervailing Duty Administrative Review of Certain Carbon Steel Products from Sweden* ("*Final Results*"), 54 Fed. Reg. 31,714 (Aug. 1, 1989). This Court has jurisdiction over the matter pursuant to 28 U.S.C. § 1581(c).

The investigation was conducted by the defendant International Trade Administration ("ITA" or "Commerce") under section 751 of the Tariff Act of 1930 ("Tariff Act"), as amended, 19 U.S.C. § 1675 (1984). Commerce reviewed grants received by SSAB from the Swedish government during the period covering March 20, 1985, through December 31, 1985, and determined the net subsidy to be 4.58 percent *ad valorem.* *Final Results* at 31,716.

Plaintiff's motion challenges this determination, and its supporting briefs raise the following three arguments: (1) Commerce's determination that a cash payment of 530 Million Swedish Kronor (MSEK) made by the Swedish government to its subsidiary Statsforetag/Norbottens Jarnverk AB ("NJA") at the time of SSAB's formation conferred a countervailable benefit upon SSAB is unsupported by substantial evidence or is otherwise not in accordance with law; (2) Commerce's application of its methodology for ensuring that subsidized loans are not countervailed in an amount greater than an outright grant of an equal amount (the so-called "grant-cap" rule) was contrary to law; and (3) Commerce's finding that monies received by SSAB from the government of Sweden in the form of employment promotion grants were countervailable subsidies was arbitrary, capricious, an abuse of discretion, and contrary to law. Plaintiff also seeks a remand to the ITA for redetermination.

Defendant opposes the motion, countering that Commerce properly countervailed against SSAB the 530 MSEK transferred from the Swedish government to NJA because the cash transfer was an integral part of SSAB's formation. Second, defendant maintains Commerce correctly applied its "grant-cap" rule to the balance of the loans treated under its short-term methodology. Third, defendant maintains that Commerce properly used "best information available" in determining that SSAB benefitted from employment grants because SSAB provided no cost information showing that it would not incur expenses absent the government program.

After careful review of the administrative record, the briefs of the parties, and all other papers and documents in evidence, this Court finds that Commerce's final determination that plaintiff received countervailable subsidies in the amount of 4.58 percent *ad valorem* is based upon substantial evidence on the record, or is otherwise in accordance with law.

## ADMINISTRATIVE BACKGROUND

On December 19, 1984, ITA received countervailing duty petitions from USX Corporation, filed on behalf of the United States industry producing certain carbon steel products. The petition alleged that manufacturers, producers, or exporters in Sweden of cold-rolled carbon steel flat-rolled products directly or indirectly received certain benefits which constitute (domestic) subsidies within the meaning of section 701 of the Tariff Act, as amended, 19 U.S.C. § 1671 (1982 & Supp.II 1984).

Commerce deemed the petition sufficient to initiate countervailing duty investigations and on January 8, 1985, initiated such investigations. 50 Fed.Reg. 2319 (Jan. 16, 1985). On August 19, 1985, ITA published its final determinations that the subject imports were being subsidized through various government programs. 50 Fed.Reg. 33,375 (Aug. 19, 1985). Commerce determined the estimated net subsidy to be 8.77 percent *ad valorem* for all entries of cold-rolled carbon steel flat-rolled products from Sweden. *Id.* The countervailing duty order was published on October 11, 1985. 50 Fed.Reg. 41,547 (Oct. 11, 1985).

On October 31, 1986, plaintiff requested an administrative review of the countervailing duty order. Administrative Record Document 1 ("A.R. Doc.") at (frame) 4. ITA published its notice of initiation of administrative review on November 18, 1986 (51 Fed.Reg. 41,649 (Nov. 18, 1986)) and, thereafter, conducted the review in accordance with section 751(a)(1) of the Tariff Act, as amended, 19 U.S.C. § 1675(a)(1) (1982 & Supp. II 1984). The review covered imports from Sweden of cold-rolled carbon steel flat-rolled products during the period March 20, 1985, through

December 31, 1985. *Final Results* at 31,-714. Plaintiff was the only Swedish exporter of the merchandise covered by the period of review. *Id.* at 31,715.

On September 15, 1988, Commerce published its *Certain Carbon Steel Products from Sweden; Preliminary Results of Countervailing Duty Administrative Review* ("*Preliminary Results*"), 53 Fed.Reg. 35,883 (Sept. 15, 1988). The notice stated that Commerce had preliminarily determined the net subsidy to be 4.57 percent *ad valorem* for the review period March 20, 1985 through December 31, 1985. *Id.* at 35,886. Thereafter plaintiff requested in accordance with 19 C.F.R. § 355.10(c)(5) that a hearing be held, and it was convened on January 12, 1989.

On August 1, 1989, Commerce published the *Final Results* of the administrative review, which are the subject of this action. 54 Fed.Reg. 31,714. Commerce determined the net subsidy during the period of review to be 4.58 percent *ad valorem*. *Id.* at 31,716. Arguments on plaintiff's motion were heard by this Court on November 13, 1990.

## DISCUSSION

### 1. *Standard of Review and Relevant Countervailing Duty Law*

Commerce's countervailing duty determination must be upheld if it is supported by substantial evidence on the record, or is otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1982). Substantial evidence " 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed.Cir. 1984) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)).

Generally, this Court accords substantial deference to Commerce's implementation of its statutory mandate inasmuch as the agency's interpretation of the statute which it is authorized to administer will be upheld as in accordance with law if reasonable and not plainly inconsistent with the statute "and [is] to be held valid unless weighty reasons require otherwise." *ICC Indus., Inc. v. United States*, 812 F.2d 694, 699 (Fed.Cir.1987). It is settled law that "[a]n agency's 'interpretation of the statute need not be the *only* reasonable interpretation or the one which the court views as most reasonable.' " 812 F.2d at 699 (quoting *Consumer Products Div., SCM Corp. v. Silver Reed America, Inc.*, 753 F.2d 1033, 1039 (Fed.Cir.1985)) (emphasis in original). Where there is substantial evidence on the record, and conflicting conclusions can be drawn therefrom, this Court will defer to the judgment of the agency, even if the agency's decision is not one the court would have adopted had it reviewed the record *de novo*. *American Lamb Co. v. United States*, 785 F.2d 994, 1001 (Fed.Cir.1986).

Countervailing duties are imposed upon imported merchandise if Commerce determines that a foreign country "is providing, directly or indirectly, a subsidy with respect to the manufacture, production, or exportation of a class or kind of merchandise imported, or sold (or likely to be sold) for importation, into the United States." 19 U.S.C. § 1671(a) (1982 & Supp. II 1984). For domestic subsidies, the amount of the countervailing duty imposed is "equal to the amount of the net subsidy." *Id.*

In the context of countervailing duty actions, the definition of the term "subsidy" is interchangeable with "bounty" or "grant" as those terms are used in section 303 of the Tariff Act of 1930 (the "Act"), as amended, 19 U.S.C. § 1303 (1982).[1] 19

---

**1.** 19 U.S.C. § 1303(a)(1) states:

    Except in the case of an article or merchandise which is the product of a country under the Agreement (within the meaning of section 1671(b) of this title), whenever any country, dependency, colony, province, or other political subdivision of government, person, partnership, association, cartel, or corporation,

shall pay or bestow, directly or indirectly, any bounty or grant upon the manufacture or production or export of any article or merchandise manufactured or produced in such country, dependency, colony, province, or other political subdivision of government, then upon the importation of such article or merchandise into the United States, whether

U.S.C. § 1677(5). Although Commerce has discretion in determining what constitutes a subsidy, 19 U.S.C. § 1677(5) provides a list of government programs that, according to Congress, are "illustrative of practices which are subsidies within the meaning of the word." S.Rep. No. 249, 96th Cong., 1st Sess. 85 (1979), U.S.Code Cong. & Admin.News 1979, pp. 381, 471. With respect to domestic subsidies, 19 U.S.C. § 1677(5) states in pertinent part:

> The term 'subsidy' has the same meaning as the term 'bounty or grant' as that term is used in section 1303 of this title, and includes, but is not limited to, the following:
>
> . . . .
>
> (B) The following domestic subsidies, if provided or required by government action to a specific enterprise or industry, or group of enterprises or industries, whether publicly or privately owned, and whether paid or bestowed directly or indirectly on the manufacture, production, or export of any class or kind of merchandise:
>
> (i) The provision of capital, loans, or loan guarantees on terms inconsistent with commercial considerations.
>
> (ii) The provision of goods or services at preferential rates.
>
> (iii) The grant of funds or forgiveness of debt to cover operating losses sustained by a specific industry.
>
> (iv) The assumption of any costs or expenses of manufacture, production, or distribution.

█ Essentially, a bounty or grant is a benefit which gives rise to an unfair competitive advantage. *Zenith Radio Corp. v. United States*, 437 U.S. 443, 455–56, 98 S.Ct. 2441, 2447–48, 57 L.Ed.2d 337 (1978). As to what constitutes a "fair" or "unfair" competitive advantage, this Court will not substitute its views for those of agency charged with the administration of the countervailing duty laws. *Id.* at 459, 98 S.Ct. at 2449. Two examples of government benefits found to confer an unfair competitive advantage include government funding to cover closure and redundancy costs (*British Steel Corp. v. United States*, 9 CIT 85, 95, 605 F.Supp. 286, 294 (1985)) and benefits which reduce labor, capital, and other costs of production. *ASG Indus., Inc. v. United States*, 82 Cust.Ct. 101, 114, 137 C.D. 4794, 467 F.Supp. 1200, 1213 (1979).

█ For domestic subsidies, the ITA must determine whether a benefit has actually been conferred upon a specific enterprise or industry. *Cabot Corp. v. United States*, 9 CIT 489, 495, 620 F.Supp. 722, 729 (1985) (citations omitted). The actual results or effects of the benefits provided must be examined and not the purposes or intentions of those benefits. 9 CIT at 495, 620 F.Supp. at 730.

█ The deference extended to Commerce's interpretation of the countervailing duty laws also applies to the methodologies utilized by Commerce. *Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 404, 636 F.Supp. 961, 966 (1986), *aff'd*, 810 F.2d 1137 (Fed.Cir.1987) (citations omitted). This Court permits the ITA "methodological flexibility" in administering the countervailing duty laws. *Id.* Commerce's methods will be upheld if they reflect a reasonable means of assessing the benefits and if "there is support in the record as a whole for its determination and its methods are in accordance with law." *Carlisle Tire & Rubber Co., Div. of Carlisle Corp. v. United States*, 9 CIT 520, 524, 622 F.Supp. 1071, 1075 (1985).

This Court will now examine Commerce's findings that certain Swedish government

the same shall be imported directly from the country of production or otherwise, and whether such article or merchandise is imported in the same condition as when exported from the country of production or has been changed in condition by remanufacture or otherwise, there shall be levied and paid, in all such cases, in addition to any duties otherwise imposed, a duty equal to the net amount of such bounty or grant, however the same be paid or bestowed.

Cases decided under 19 U.S.C. § 1303 and 19 U.S.C. § 1677(5) are treated as the same in determining whether a countervailable "subsidy" exists under the countervailing duty laws. *See, e.g., Cabot Corp. v. United States*, 9 CIT 489, 494–95, 620 F.Supp. 722, 729 (1985).

programs conferred countervailable subsidies on SSAB to determine whether they are based upon substantial evidence on the record or were otherwise in accordance with law.

### 2. *Government Equity Infusion*

██ In the *Final Results*, Commerce found that in 1978, as part of SSAB's formation, SSAB received a government equity infusion from the Swedish government on terms inconsistent with commercial considerations. *Final Results* at 31,715. Commerce calculated the benefit to SSAB to be 530 MSEK and countervailed same. *Id.* at 31,716.

The relevant circumstances surrounding the formation of SSAB were described by Commerce as follows:

> SSAB was formed in 1978 as a joint-venture between Gränges AB and Stora (both privately-owned), Statsforetag/Norbottens Jarnverk AB (NJA) (government-owned) and the Government of Sweden. Under the terms of the formation agreement, Gränges, Stora and NJA each transferred to SSAB steel assets valued at 700 million Swedish kronor (MSEK) in exchange for 25 percent shares of SSAB stock. The government also contributed 700 MSEK in cash in exchange for a 25 percent share of SSAB stock.

*Id.* at 31,715. With respect to NJA, Commerce noted that NJA's participation in the formation agreement was conditioned upon the Swedish government advancing cash of 530 MSEK to NJA "to cover the loss in book value of the assets transferred to SSAB." *Id.* at 31,716; *see* Confidential Record Document ("C.R.Doc.") 2 at (frame) 1195–96. In the *Final Results*, the ITA concluded that it "considere[d] the 530 MSEK to be an assumption of cost by the government on behalf of SSAB" and "that the 530 MSEK contributed by the government to effect this transfer [of steel assets] confers a countervailable benefit on SSAB." *Final Results* at 31,716.

Plaintiff asserts that the Swedish government's payment to NJA of 530 MSEK conferred no benefit on SSAB. Plaintiff contends that NJA incurred a book loss because the book value of its steel assets transferred to SSAB exceeded the negotiated price of 700 MSEK, and the payment of 530 MSEK under the formation agreement was necessary to offset the loss on NJA's books to avoid liquidation under Swedish law. *See* A.R.Doc. 20 at (frame) 305.

The question before this Court then is whether there is substantial evidence on the record supporting Commerce's determination that the Swedish government assumed costs on behalf of SSAB or whether that determination was in accordance with law. In other words, whether SSAB obtained through some government action an unfair competitive advantage at the time of its formation. This Court holds that Commerce's finding that SSAB received a countervailable benefit of 530 MSEK was based upon substantial evidence on the record, or was otherwise in accordance with law.

██ Although involvement by a government in a transaction does not *per se* constitute a countervailable benefit (*Certain Fresh Cut Flowers from the Netherlands*, 54 Fed.Reg. 3301, 3311 (1987)), the Swedish government's role in the formation agreement was integral to its overall implementation. The terms of the formation agreement reveal that the 530 MSEK payment to NJA was an explicit condition for the transfer of assets to SSAB:

> The effectiveness of this [Formation] Agreement is conditional upon the State allocating to NJA ... 530.000.000 [MSEK] Swedish Crowns to make good the loss sustained in connection with NJA's sale of capital assets to [SSAB] in accordance with this Agreement....

C.R.Doc. 2 at (frame) 1195–96. SSAB's own questionnaire responses of 1985 reveal that the Swedish government was fully aware that the NJA asset transfer to SSAB under the Agreement was made well below book value:

> 530 MSEK was paid by the Government directly to NJA, to save it from bankruptcy. In each case the problem was the same: the assets being transferred to SSAB for 700 MSEK had values on

the books of Gränges and NJA far in excess of that figure.

C.R.Doc. 2 at (frame) 1113. SSAB's questionnaire response also shows that NJA's transfer to SSAB of its steel assets apparently occurred at a price bearing no relation to the actual commercial value of those assets:

> Each party agreed to contribute, at an agreed valuation of 700 MSEK, all its carbon steel plants and equipment in return for 25% of the shares of SSAB. (*These assets had recently been appraised, by two outside consultants, at several times the indicated aggregate value of 2,100 MSEK.*)

C.R.Doc. 2 at (frame) 1112 (emphasis added).

■ Plaintiff's argument that the Swedish government's 530 MSEK transfer to NJA was done merely for its own convenience to balance NJA's account, even if accepted, does not undermine Commerce's finding. First, the purposes or intentions of a foreign government in effecting financial backing or attaching other subsidies are irrelevant. *Cabot*, 9 CIT at 495, 620 F.Supp. at 730. The issue is whether the company benefitted from the government action by obtaining some unfair competitive advantage. *See Zenith Radio Corp.*, 437 U.S. at 455–56, 98 S.Ct. at 2447–48 (legislative purpose of countervailing duties under 19 U.S.C. § 1303 was "to offset the unfair competitive advantage" that foreign companies receive from government subsidies). Because the record shows that the Swedish government via NJA parted with certain steel assets at a price of below that which NJA's records indicated they were worth, Commerce reasonably concluded that SSAB, as the recipient of those discounted assets, benefitted. Second, even if NJA were not given the 530 MSEK by the Swedish government, NJA, a wholly owned government subsidiary, sold assets well below what their own records indicated they were worth. The government transfer of 530 MSEK to its subsidi-

ary merely highlights the basic fact that NJA took at least a 530 MSEK loss through its participation in SSAB's formation.

Alternatively, plaintiff argues that at the time NJA transferred its assets to SSAB, NJA's balance sheet was being depleted by three separate circumstances, only one of which involved the asset transfer to SSAB. Plaintiff states that the 530 MSEK payment to NJA was occasioned by all three of these circumstances and, therefore, only a proportionate share should be attributed to the SSAB transaction. This argument is unpersuasive. The formation agreement supports Commerce's determination that loss incurred by NJA as a result of the asset transfer was 530 MSEK, and plaintiff has not provided adequate evidence for this Court to disturb that finding. *See* C.R. Doc. at (frames) 1195–96.

■ This Court defers to ITA's expertise in determining precisely how a company benefits from a subsidy, so long as it is reasonable. The discounted assets could reasonably be viewed as giving SSAB an unfair competitive advantage by lowering at least one of its costs of production— namely, the cost of obtaining carbon steel plants and equipment.[2] Consequently, this Court holds that Commerce's determination to countervail the Swedish government's equity infusion to be based on substantial evidence on the record or otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B).

3. *Reconstruction Loans*

■ Plaintiff challenges Commerce's application of its grant methodology in the *Final Results* with respect to reconstruction loans provided by the Swedish government as contrary to law.

A. *Commerce's Preliminary Determinations*

At the time of SSAB's formation, the Swedish government agreed to provide re-

---

**2.** *See British Steel*, 9 CIT at 98, 605 F.Supp. at 296 ("Subsidies for the purchase of capital assets bestow a benefit to the recipient firm by relieving it not only of the immediate costs normally incurred in acquiring such assets (thereby freeing up other funds for other uses), but also by relieving the firm of the continuing annual costs of acquiring an asset.").

construction loans to SSAB between 1978 and 1985 to cover SSAB's anticipated operating losses from 1978 through 1982 and, subsequently, for employment promotion. *Preliminary Results* at 35,884. Commerce preliminarily determined that these loans constituted subsidies to SSAB because they were authorized for SSAB under special government legislation and were given to SSAB on terms inconsistent with commercial considerations. *Id.* Although up to half of the loans could be written off after two years under the terms of reconstruction loan contracts, Commerce found that the government of Sweden forgave some loans in their entirety after just one year. *Preliminary Results* at 35,884.

After having determined that the reconstruction loans were made on terms inconsistent with commercial considerations, Commerce used a three-step process to calculate the total benefit to SSAB from the reconstruction loans. First, Commerce treated those portions of the loans that were written-off through 1985 (a total of seven) as outright grants, and used the following methodology to measure the grant benefit:

> [W]e used a declining balance methodology to measure the benefit. We allocated the benefits from each grant over 15 years, the average useful life of assets in the steel industry, according to the asset guideline classes of the Internal Revenue Service. We used as discount rates SSAB's weighted-average cost of capital in each year from 1979 to 1985.

*Preliminary Results* at 35,884;[3] *see* C.R. Doc. 4 at (frame) 806. Second, to measure the benefit of the outstanding loan balance (without the forgiven portions) as of December 31, 1984, Commerce employed its "short-term" methodology, which involved treating the loan balance as a series of short-term loans because the loans had a variable interest rate that changed on a

yearly basis. *Preliminary Results* at 35,-884. Third, Commerce divided the sum of the grant and loan benefits by the value of SSAB's 1985 sales. Commerce determined the total benefit for all reconstruction loans to be 1.43 percent *ad valorem. Id.*

B. *The Final Results: Commerce's Application of the Grant–Cap Rule to the Outstanding Loan Balances as of December 31, 1984*

At the public hearing before ITA on January 12, 1989, plaintiff expressed concern that the outstanding loan balances as of December 31, 1984, had been excessively countervailed under Commerce's short-term methodology and requested that Commerce treat those loans as grants. *Final Results* at 31,716. This request to have the reconstruction loans treated as grants was understood by Commerce as a request to employ what is referred to as its "grant-cap" rule, which is discussed below. In response to plaintiff's request, Commerce applied a grant-cap to the loans but nevertheless determined in the *Final Results* "that the amount of countervailing duties calculated for the conditional reconstruction loans is significantly lower than if we had treated these loans as grants." *Final Results* at 31,716.

(1) *The Grant–Cap Rule Applied*

Commerce's practice concerning the extent to which subsidized loans would be countervailed within a given year, referred to by Commerce as the "grant-cap" rule, was explained in *Final Affirmative Countervailing Duty Determinations; Certain Steel Products from Belgium* ("*Steel from Belgium*"), 47 Fed.Reg. 39,304, 39,320 (Sept. 7, 1982). In *Steel from Belgium,* Commerce stated that with respect to subsidized loans, it applies

> a grant cap (the amount of the subsidy [that would have been] allocated to the year of review if the original principal had been received as a grant rather than

---

3. The declining balance methodology is the methodology used by Commerce in calculating the stream of benefits from a grant over a period of time (generally the useful life of the assets). *See* Transcript of Hearing at 48–49 (Nov. 13, 1990). The weighted-cost of capital

represents the company's actual cost of raising money. *See* "Subsidies Appendix" to *Cold–Rolled Carbon Steel Flat–Rolled Products from Argentina: Final Affirmative Countervailing Duty Determination and Countervailing Duty Order,* 49 Fed.Reg. 18,006, 18,017 (Apr. 26, 1984).

a loan) because a loan cannot be worth more to a company than an outright grant of the same amount.

*Id.*[4]

In its Rule 56.1 brief, defendant sets out the grant methodology that Commerce employed to calculate the benefit which would have been conferred upon SSAB if the loans with outstanding balances as of January 1, 1985, had been treated as grants. Defendant's Brief at 25–26 n. 26. This methodology was described in *Stainless Steel Wire Rod from Spain; Preliminary Results of Countervailing Duty Administrative Review*, 54 Fed.Reg. 16,384–85 (Apr. 24, 1989) as follows:

> the 'grant equivalent' [is calculated for] each disbursement by determining the present value (at the time the preferential loan was made) of the difference in annual payments that would occur during the life of the loan. Using [Commerce's] declining balance methodology with the long-term commercial benchmark as the discount rate, [Commerce] allocate[s] the grant equivalents over the life of the loan. [Commerce] then total[s] the review period benefits allocated for each disbursement.

Commerce applied its grant-cap methodology to the individual outstanding balances of the reconstruction loans as of December 31, 1984, totalled the individual balances, and arrived at a grant equivalent that *exceeded* the countervailable benefit from the loans under the short-term methodology originally employed. *See* C.R.Doc. 4 at (frame) 806; Defendant's Brief at 25–26 n. 26. Consequently, Commerce readopted its preliminary countervailing duty determination for the reconstruction loans. *See Preliminary Results* at 35,884.

**(2)** *Plaintiff's Alternative Grant–Cap*

In its Rule 56.1 brief, plaintiff puts forth a sample grant-cap calculation that it believes Commerce should have applied in this case. Plaintiff's Brief at 21–23. Plaintiff asserts that the grant-cap should have been calculated by multiplying only four of seven loans which were forgiven and treated as grants by the weighted-average cost of capital from 1979.

■ Plaintiff creates a grant-cap based upon the sum of only four of seven reconstruction loans which Commerce determined were forgiven by the Swedish government and, therefore, constituted grants. Plaintiff's explanation for calculating its grant-cap based upon the sum of only four loans is its assertion that the balance of the loan authorization was never used and was canceled by the Swedish government. Plaintiff's Brief at 21. This Court does not find adequate support in the record to uphold plaintiff's assertion that the loan authorization was canceled. Although plaintiff did request in its Prehearing Brief (A.R.Doc. 20 at (frames) 337–38) and at the hearing before Commerce that Commerce test *four* reconstruction loans under the grant-cap rule, this Court finds that Commerce acted properly in not limiting application of the grant-cap rule to four reconstruction loans when there was evidence in the record that seven, not four reconstruction loans were written-off in part or in full. *See* C.R.Doc. 2 at (frame) 224 (SSAB's questionnaire response).

■ Moreover, plaintiff's claim that Commerce should have used the 1979 weighted-cost of capital in calculating the grant-cap for each succeeding year was not raised before Commerce at the administrative level. Therefore, that claim is not

---

**4.** Commerce's "grant-cap" methodology for countervailing subsidized loans was reiterated in the Subsidies Appendix to *Cold–Rolled Carbon Steel Flat–Rolled Products from Argentina: Final Affirmative Countervailing Duty Determination and Countervailing Duty Order*, 49 Fed. Reg. 18,006, 18,016–020 (Apr. 26, 1984). There, Commerce explained that:

> As under Appendix 2 [set forth in *Steel from Belgium* ], we will not impose greater countervailing duties for a subsidized loan (to a cre-

ditworthy or an uncreditworthy company) than for an outright grant in the amount of the loan principal, because a loan cannot be worth more to a company than an outright grant of the same amount.

*Id.* at 18,020. Commerce has proposed to codify its existing practice in its *Countervailing Duties; Notice of Proposed Rulemaking and Request for Public Comments*, 54 Fed.Reg. 23,366, 23,384–85 (May 31, 1989) ("Proposed Rules").

properly before this Court. *See Unemployment Compensation Commission of Alaska v. Aragon,* 329 U.S. 143, 155, 67 S.Ct. 245, 251, 91 L.Ed. 136 (1946); *United States v. L.A. Tucker Truck Lines,* 344 U.S. 33, 37, 73 S.Ct. 67–69, 97 L.Ed. 54 (1952); *Rhone Poulenc, S.A. v. United States,* 899 F.2d 1185, 1191 (Fed.Cir.1990).[5] This Court declines to speculate on the merits of plaintiff's assertion *de novo.* To do otherwise would deprive the Court as well as the litigants of the value of Commerce's expertise in addressing the particular issue. No special circumstances have been raised that persuade this Court to circumvent the statutory scheme and address the issue before Commerce has been given an opportunity to examine the question in the first place.

Substantial deference should be given to Commerce in the application of its various methodologies. *Ceramica Regiomontana,* 10 CIT at 404, 636 F.Supp. at 966. Upon plaintiff's request, Commerce's grant-cap scheme was applied to the outstanding balances of the reconstruction loans as of the end of the review period. Plaintiff has not shown, nor is there adequate evidence in the record, that Commerce's application of its grant-cap methodology is clearly flawed or unreasonable. Commerce found that the amount countervailed under the original short-term methodology does not exceed the limit imposed by the grant-cap rule. *See* C.R.Doc. 4 at (frame) 806. Consequently, the finding of Commerce that the reconstruction loans tested as grants do not exceed the grant-cap is upheld as supported by substantial evidence on the record, or otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B).

### 4. *Employment Promotion Grants*

■ Plaintiff challenges ITA's use of best information available to find that monies given to SSAB in the form of government employment promotion grants constitute countervailable subsidies. In short, plaintiff claims that certain information

ITA needed was not specifically requested by ITA.

In March 1977, in response to an economic recession in Sweden, the Swedish government provided employment grants to numerous Swedish companies in different industries, including SSAB. *Preliminary Results* at 35,885. Designed to prevent layoffs, these grants covered "75 percent of the wages and salaries of surplus workers who performed work at the company that was unrelated to the normal production activities." *Id.*

In the ITA questionnaire sent to SSAB (and to the government of Sweden) following ITA's initiation of the administrative review in issue, SSAB was asked to respond to the following set of questions for each grant provided to it:

a. The name of the government program and the government agency administering the grant program; and

b. The purpose, eligibility requirements, date of government grant approval, date of receipt of funds, and all terms and conditions relating to receipt of the grant.

A.R.Doc. 3 at 21–22. In the *Final Results,* Commerce stated that SSAB did not provide Commerce with information showing that SSAB was not relieved of costs and obligations it would have incurred absent the employment promotion grants. As a result, Commerce relied on "best evidence available" in concluding that the Swedish government assumed costs that SSAB otherwise would have had to pay. *Final Results* at 31,716.

This Court finds Commerce's determination to countervail the grants based upon substantial evidence or otherwise in accordance with law. Commerce properly used the best information available to it because it was not provided with adequate information to reach a determination. *See* 19 U.S.C. § 1677e.

There is no dispute that SSAB received payments under the program. Commerce's questionnaire was addressed to SSAB, the

---

**5.** As noted earlier, Commerce stated in it *Preliminary Results* that it used the weighted-average cost of capital (the discount rate) *in each year from 1979 to 1985.* 53 Fed.Reg. at 35,884. SSAB's lowest weighted-cost of capital occurred in 1979. C.R.Doc. 4 at (frame) 804.

subject of Commerce's countervailing duty investigation. It was incumbent upon SSAB to provide, if it could, information demonstrating that the payments made under the grant program were not subsidies. Information regarding SSAB's costs and obligations under the grant program (or in its absence) was reasonably viewed by Commerce as important for it to reach a countervailing duty determination.[6]

Plaintiff argues, however, that Commerce's treatment of SSAB was arbitrary because identical grants made under the same program have been found not countervailable in another ITA determination, *Final Affirmative Countervailing Duty Determination: Certain Stainless Steel Hollow Products from Sweden*, 52 Fed. Reg. 5794 (Feb. 26, 1987) (*"Hollow Products"*).

In the instant case, Commerce distinguished its prior determination in *Hollow Products* because the grants received by the companies in *Hollow Products* were not countervailable against those companies because they "were not relieved of any obligations they otherwise would have incurred absent the employment promotion grants." *Final Results* at 31,716.[7] In *Hollow Products*, Commerce reached its determination following its verification process. *Hollow Products* at 5799. Verification is ITA's confirmation procedure in which it verifies "the accuracy and completeness of submitted factual information." 19 C.F.R. § 355.36(C).

SSAB's failure to submit information that would permit Commerce to determine whether or not or to what extent the grant was countervailable left Commerce with little choice but to rely upon best information available. Commerce is not required to and should not perform guesswork in determining whether a government program is countervailable, and the law is plain that Commerce may use best evidence available to countervail subsidies when it is not provided with adequate information that it can verify. *See* 19 U.S.C. § 1677e; *Ceramica Regiomontana*, 10 CIT at 406, 636 F.Supp. at 967.

## CONCLUSION

Based upon the foregoing, Commerce's findings in *Final Results of Countervailing Duty Administrative Review on Certain Carbon Steel Products from Sweden*, 54 Fed.Reg. 31,714 (Aug. 1, 1989) are upheld as based upon substantial evidence on the record, or otherwise in accordance with law.

Plaintiff's motion is denied; action dismissed.

---

6. For instance, without cost information from SSAB, Commerce could not determine whether some or all the payments received under the grant program offset any additional cost incurred by SSAB incident to the grant program, such as application fees or deposits. *See, e.g., Viscose Rayon Staple Fiber from Sweden, Preliminary Results of the Administrative Review of Countervailing Duty Order*, 46 Fed.Reg. 35,949, 35,950 (July 13, 1981).

7. In *Hollow Products*, the ITA made the following findings with respect to the respondents' costs and obligations surrounding the employment grants under the government program:
At verification, we found that [Respondents'] were the only producers of SSHP that re-

ceived grants under this program. We found that the companies were required to contribute either 25 percent of the affected employees' salaries, or a portion of the costs related to the training/education courses. But for this government program, neither of these companies would have been liable for expenses related to these employees who otherwise would have been dismissed. Because we saw no evidence that: (1) The classes were for jobs related to stainless steel production; or (2) that either of these companies was relieved of any expenses it otherwise would have incurred absent this program, we determine that no countervailable benefit was bestowed under this program.
52 Fed.Reg. at 5799.