Bernice LASOVICK, Appellant,

v.

Jesse BROWN, Secretary of Veterans Affairs, Appellee.

No. 91–1591.

United States Court of Veterans Appeals.

Argued Aug. 10, 1993.

Decided Jan. 11, 1994.

Mark J. DeFrancisco, Boston, MA, for appellant.

Mary Ann Flynn, with whom Mary Lou Keener, Gen. Counsel, Norman G. Cooper, Asst. Gen. Counsel, and Pamela L. Wood, Deputy Asst. Gen. Counsel, were on the brief, for appellee.

Before KRAMER, IVERS and STEINBERG, Judges.

STEINBERG, Judge, filed the opinion of the Court in which KRAMER, Judge, joined.

IVERS, Judge, filed an opinion concurring in part and dissenting in part.

STEINBERG, Judge:

The appellant, Bernice Lasovick, appeals a June 28, 1991, Board of Veterans' Appeals (BVA or Board) decision denying entitlement to service connection for the cause of her World War II veteran husband's death. *Bernice Lasovick*, BVA 91–19033 (June 28, 1991). Having considered the parties' briefs, supplemental briefs, and presentations at oral argument, the Court will affirm in part the Board's decision and remand the matter to the Board for further proceedings consistent with part II.B.2. of this opinion.

## I. Background

The veteran, Daniel Lasovick, served on active duty in the U.S. Army from June 10, 1943, until March 9, 1946. R. at 1093. From March 17, 1944, until August 30, 1946, he worked as a chemist at the Los Alamos Scientific Laboratories in New Mexico (working as a civilian from March 10 to August 30, 1946), and was involved there in the "Manhattan Project" in developing the first nuclear bombs. R. at 409–1049, 1052, 1134.

In July 1974, the veteran was diagnosed, apparently at a private hospital, as having malignant lymphoma. R. at 87–89. He died due to that disease in March 1975. R. at 1085. In June 1983 and April 1985, his widow (the appellant here) filed with a Veterans' Administration (now Department of Veterans Affairs) (VA) regional office (RO) an application for dependency and indemnity compensation benefits (VA Form 21–534 entitled "APPLICATION FOR DEPENDENCY AND INDEMNITY COMPENSATION OR DEATH PENSION BY SURVIVING SPOUSE OR CHILD") claiming that the lymphoma which caused her husband's death was the result of his in-service exposure to ionizing radiation while working on the Manhattan Project. R. at 7–10, 1084. In a December 1985 decision, the RO denied the claim, concluding:

> The veteran's widow *claims* the veteran had exposure to ionizing radiation (uranium and plutonium) while working on the Manhattan Project at Los Alamos, New

Mexico laboratories. Available service medical records are negative for any indication of the cause of death. The acute lymphoblastic lymphoma is not shown within one year of discharge from service, and is not one of the radiogenic diseases listed in 38 C.F.R. § 3.311b(2).

R. at 1090 (emphasis added). The claimant failed to perfect a timely appeal of that decision. R. at 1139.

In June 1989, the RO, acting on its own initiative, undertook a "[r]eview of [the] denied radiation claim" (R. at 1099) under the provisions of the Radiation–Exposed Veterans Compensation Act of 1988, Pub.L. No. 100–321, 102 Stat. 485 (1988) (currently codified at 38 U.S.C.A. § 1112(c) (West 1991)), which established a presumption of service connection for certain diseases becoming manifest to a degree of 10% in certain radiation-exposed veterans within 40 years (30 years in the case of leukemia) after their radiation exposure. (In 1992, Congress repealed both the 10% manifestation requirement and the 30– and 40–year ceilings. Veterans' Radiation Exposure Amendments of 1992, Pub.L. No. 102–578, § 2, 106 Stat. 4774.) In a "CONFIRMED RATING DECISION" issued on June 9, 1989, the RO denied the claim, stating:

> Claim previously denied as lymphoma not listed as radiogenic disease under 38 C.F.R. § 3.311b. *All evidence received from Los Alamos National Laboratory 6– 6–89 reviewed. Veteran was exposed to radioactive material as laboratory chemist for the Manhattan Project.* There is no documentation of onsite participation during Operation Trinity 7–16–45 to 8–6– 45 or for the 6 month period thereafter. No change in denial of SC for cause of death.

R. at 1099 (emphasis added). That decision indicated that evidence had been "received subsequent to rating action dated[ ] 12–12– 85" and that "[t]his evidence does not warrant change in service-connected status or evaluation of any disability or contain any new and material evidence relevant to the question at issue which was not on file when the previous decision was made. Such decision is therefore CONFIRMED." *Ibid.* In July

1989, in response to an RO letter informing her that the "prior denial of service connection for cause of death is confirmed and continued", the claimant filed a Notice of Disagreement (NOD) to initiate review of that decision within VA's administrative adjudication process. She stated: "I do not accept this letter as final. I would like to appeal." R. at 1102.

In July 1989, the RO issued a Statement of the Case (SOC), which stated, inter alia, that on June 6, 1989, the RO had received records from the Los Alamos Laboratory "document[ing] that the veteran was exposed to radio active [sic] material as a laboratory chemist for the Manhattan Project." R. at 1103–08. Those records show that the veteran had sustained radiation exposure from uranium and apparently from plutonium at the laboratory, described the amount of exposure as "moderate", and stated that he did not have any prior industrial exposure. R. at 18, 44, 66–68.

The record contains two letters from George Voelz, M.D., Health Division Leader of Los Alamos Laboratories, who was conducting "long term follow-up studies on present and past plutonium workers at Los Alamos". R. at 1052. In an October 7, 1974, letter to the veteran, Dr. Voelz thanked him for his cooperation in the studies and for his September 1974 submission of a urine sample and stated:

> Your body burden of plutonium is estimated to be 13 nanocuries (nCi) based on the information available from your urine excretion data in 1946. A body burden of 13 nCi is about one third of the current maximum permissible body burden (40 nCi) that is considered safe for occupational worker exposure according to the national and international professional committees that make recommendations on radiation exposure standards. Your body burden estimate may well be modified as a result of the assay of [the September 1974 urine sample] by the more sensitive and accurate assay methods used today, although generally we find [that] the earlier estimates seem to be reasonably good.

R. at 1051. Two days later, in a letter to the veteran's physician, Dr. Voelz wrote: "[The

veteran's] body burden of plutonium is estimated to be 12 [nCi] which is about one-quarter of the current maximum permissible (i.e. safe) body burden." R. at 1052. In a January 1975 letter to the veteran, Dr. Voelz wrote:

We do indeed have the results on your urine sample from last September. I am sorry that I did not pass on the results to you earlier.

We were unable to detect any uranium in your sample. This is not at all surprising in view of the many years since your work here and the fact that uranium would not be expected to remain in the body over such long periods of time. Our detection limit is less than 0.05 nuclear disintegrations per minute in the total sample.

We were able to detect a trace of plutonium which was measured at 0.11 disintegrations per minute in a 24 hour sample. This is a very small value. Our current estimate of your possible uranium exposure is based essentially on only one positive urine sample while you were here in 1945.

R. at 1053. The record also contains an October 1980 letter to an assistant United States attorney from James F. McInroy, Ph. D., Acting Alternate Group Leader of the Epidemiology Group at Los Alamos Laboratory. R. at 1077–78. Dr. McInroy stated that he had calculated estimates of "the whole body deposition of plutonium in Mr. Lasovick" based on tissue samples obtained upon exhumation five years following the veteran's death. Noting that such estimates "are difficult because we don't know what the actual weights of his organs and tissues were when he was living", Dr. McInroy stated: "[T]he whole body depos[i]tion is less than 3 nanocuries". R. at 1077.

Also of record is a three-page sworn affidavit, dated August 9, 1979, from John Gofman, M.D., Ph.D., of San Francisco, California. R. at 1062–64. Dr. Gofman's affidavit asserts his opinion, in pertinent part, as follows:

[M]alignant lymphocytic lymphoma is induced [in humans] by ionizing radiation. The Report of the Science Work Group of the Interagency Task Force on Ionizing Radiation, entitled "Biological Effects of Ionizing Radiation["], February 20, 1979, (U.S. Department of Health, Education, and Welfare), lists five separate sources of evidence of the induction of lymphoma by ionizing radiation in man.

... [S]ince ionizing radiation has been demonstrated to induce lymphoma in man, it is clear that plutonium alpha radiation will be capable of inducing that disease....

Plutonium emits alpha particles, and alpha particles have been directly shown to produce human cancer in the radium workers and in the uranium miners. Therefore, the direct evidence that alpha particles produce human cancer is available....

The decedent, Daniel Lasovick, worked in close proximity to plutonium sources, and hence had ample opportunity to have incorporated plutonium into his body tissues.

. . . .

When such plutonium compounds are inhaled, the quantity reaching the kidney for excretion in urine can be very low and thereby give a grossly erroneous and low value for the body burden. The urine method used at Los Alamos for assessing body burden was not meant to be valid for assessing the burden from inhaled, insoluble plutonium compounds.

... Therefore, with plutonium inhalation, there can be no question but that lymphatic tissue will be exposed to plutonium alpha radiation. Therefore, there is no question that the hazard of induction of lymphoma exists for such plutonium exposure. The quantitative magnitude of the hazard is determined by the extent of plutonium inhalation and deposition.

... It is clear that swipes taken in the Laboratory where the decedent worked showed plutonium contamination, so there is no question of the opportunity for inhalation of plutonium. The urinalyses in no way provide evidence that highly significant quantities of plutonium were not taken in by Mr. Lasovick.

... There is ample reason to question the Los Alamos [Laboratory] values for the burden in any case, but whatever that

burden was as estimated from urinalyses, it is inappropriate to dismiss such burden with respect to lymphoma induction. It must be emphasized that this is wholly in addition to the risk from inhaled insoluble plutonium, which is poorly reflected in any urinalysis.

... The estimation of the risk of lymphoma induction from plutonium exposure in Mr. Lasovick will become possible through resolution of the quantity taken in, through the process of discovery and possibly through tissue analysis.

... [T]here is every reason to expect that plutonium exposure will induce malignant lymphoma in proportion to the radiation dose in rems delivered to the lymphatic tissues.

R. at 1062–64.

There is no indication in the record as to when this affidavit was received by VA, although it could have been subsequent to the 1985 RO decision. The affidavit is styled as for the case of *Bernice Lasovick vs. United States of America* in the District Court of the United States for the District of New Mexico (Civil No. 77–328–M) and recites: "If called upon to testify in the trial of the above-captioned case, I would testify as follows". R. at 1062. No document in the record associated with the 1985 RO decision makes reference to the evidence provided in this affidavit or to the affidavit itself. On the VA Form 1–9 (Appeal to the BVA), dated September 22, 1989, and stamped as received on September 28, 1989, the appellant stated:

I wish to appeal this [1989 RO] decision because data available in files available to the government, and in files held by attorney Alan Einhorn ... determine that the US government was negligent, and therefor [sic] responsible for the death of my husband. *Mr. Einhorn is transferring information from his files to ... my representative from the Jewish War Veterans.*

R. at 1125 (emphasis added).

In January 1990, the claimant testified under oath at a personal hearing before the RO. R. at 1109–23. At the hearing, the claimant's representative made the following statement:

[The claimant's] claim is based on the belief, and we hold this belief, that while employed at Los Alamos Atomic Bomb Project, the late Mr. Lasovick was exposed to plutonium and he retained plutonium in his body from that time until the date of his death. He was a person in good health until the development of malignant lymphoma in his mid 50's and it's our contention that this was caused by the plutonium or radiation exposure causing his death on March 23, 1975.

R. at 1110. At the conclusion of the hearing, the RO Hearing Officer stated: "I'll do a complete review of the evidence already on file and go over it with a fine-toothed comb and *see if I can fit it into one of the possible avenues of granting service connection.*" R. at 1122 (emphasis added). In May 1990, the Hearing Officer issued a decision denying the claim on the grounds that the veteran had not participated in a radiation-risk activity for purposes of section 1112(c) and that "[t]he claimant has submitted no new and material evidence in support of her claim, and, in the absence of clear and unmistakable error on the part of the local rating activity, the denial of service connection for cause of death must be affirmed." R. at 1128.

In a December 1990 decision, the BVA remanded the claim to the RO for issuance of a Supplemental SOC (SSOC), stating:

[The claimant] has not been advised of the pertinent criteria applicable to the finality of decisions of the [RO] which are not timely appealed or where an appeal is not perfected nor has she been advised of the impact of the prior unappealed denial on her reopened claim and the need to establish a new factual basis with new and material evidence which would warrant allowance.

R. at 1134. On remand, the RO issued an SSOC in January 1991 informing the claimant of the law pertaining to finality of prior unappealed RO decisions and to reopening. R. at 1137–40. The SSOC stated that "the original denial of service connection for cause of death was promulgated in 1985, contains no clear and unmistakable error, and[,] when

you did not file a formal appeal, became final in 1986"; the SSOC further stated that the claimant had not submitted new and material evidence. R. at 1139. In a May 1991 written submission to the Board, the appellant's representative reviewed the written presentation he had submitted in October 1990 (R. at 1132) (raising the contention that the cause of the veteran's death from lymphoma had been his work on active duty on the Manhattan Project and requesting an independent medical evaluation on that issue) and reiterated the contention that the lymphoma was due to radiation to which the veteran had been exposed while on active duty working on the Manhattan Project. R. at 1141.

In the decision here on appeal, the BVA adjudicated only the issue of "[e]ntitlement to service connection for the cause of the veteran's death under the provisions of section [1112(c)], [t]itle 38, United States Code". *Lasovick*, BVA 91–19033, at 1. The Board concluded that the section 1112(c) presumption of service connection was inapplicable because the veteran had not participated in any "radiation-risk activity" as defined in the statute. *Id.* at 3–4.

In her brief on appeal to this Court and supplemental brief filed pursuant to a July 1, 1993, order of the Court, and at oral argument, the appellant asserts that the Board erred in failing to consider the issue of the veteran's entitlement to service connection, without regard to the statutory presumption in section 1112(c), under other generally applicable statutory and regulatory provisions governing service connection. Br. at 9–12; Supplemental (Supp.) Br. at 5–8. Specifically, she asserts that the Board was required to adjudicate the issue of entitlement to "direct" service connection under 38 U.S.C.A. § 1110 (West 1991). *See also* 38 C.F.R. § 3.303(d) (1993) ("[s]ervice connection may be granted for any disease diagnosed after discharge, when all the evidence, including that pertinent to service, establishes that the disease was incurred in service"). The Secretary of Veterans Affairs (Secretary), in his brief and supplemental brief and at oral argument, asserts that the sole issue before the BVA was the issue of the veteran's entitlement to service connection under the section 1112(c) presumption, because the issues of

service connection for lymphoma under other statutory and regulatory provisions had been previously and finally adjudicated by the RO in 1985 and a claim for reopening or revision of that 1985 decision was not properly before the Board in June 1991. Br. at 9–12; Supp. Br. at 4–7.

## II. Analysis

### A. Presumptive Service Connection under Section 1112(c)

■ Pursuant to section 1112(c) a "radiation-exposed veteran" who develops one of 15 specified diseases, of which lymphoma is one, at any time after service is entitled to service connection for that disease. That statutory provision defines a "radiation-exposed veteran", insofar as is relevant to this case, as a veteran who, while on active duty, participated in a "radiation-risk activity". 38 U.S.C.A. § 1112(c)(4)(A) (West 1991). "Radiation-risk activity" is defined as meaning any of the following:

(i) Onsite participation in a test involving the atmospheric testing of a nuclear device.

(ii) The occupation of Hiroshima or Nagasaki, Japan, by United States Forces during the period beginning on August 6, 1945, and ending on July 1, 1946.

(iii) Internment as a prisoner of war in Japan (or service on active duty in Japan immediately following such internment) during World War II which (as determined by the Secretary) resulted in an opportunity for exposure to ionizing radiation comparable to that of the veterans described in clause (ii) of this paragraph.

38 U.S.C.A. § 1112(c)(4)(B) (West 1991).

■ The appellant has not asserted that the veteran had any radiation exposure other than his exposure during the course of his laboratory work as a chemist at the Manhattan Project. As the Board correctly concluded, the veteran's radiation exposure does not constitute a "radiation-risk activity" as defined by the statute and, hence, the statutory presumption of service connection in section 1112(c) is not applicable to the veteran's lymphoma. The Court thus finds no error in the Board's denial of service connection under

section 1112(c) and will affirm the Board decision as to that matter.

## B. Direct Service Connection under Section 1110 and § 3.303(d)

■ *1. Jurisdiction:* As a preliminary matter, the Court must decide whether it has jurisdiction to review the appellant's claim that the Board was required to adjudicate the question of the veteran's entitlement to direct service connection under 38 U.S.C.A. § 1110; 38 C.F.R. § 3.303(d), or whether the Court's jurisdiction is limited to review of the Board's determination that the veteran's lymphoma was not presumptively service connected under section 1112(c). In order for this Court to have jurisdiction over an appeal from an adverse BVA decision, a claimant or his or her representative must have filed with a VARO on or after November 18, 1988, a valid NOD with respect to the RO's determination on the claim appealed to the Board. Veterans' Judicial Review Act, Pub.L. No. 100–687, § 402, 102 Stat. 4105, 4122 (1988) (found at 38 U.S.C.A. § 7251 note (West 1991)); *see Hamilton v. Brown*, 4 Vet. App. 528, 531 (1993) (en banc).

The Court holds that on the facts in this record it has jurisdiction over the appellant's contentions as to the direct-service-connection claim. The RO in its June 1989 decision did not purport to adjudicate only a "new" claim for entitlement to service connection for lymphoma under the liberalizing law. Rather, the express language of that decision and the January 1991 SSOC explaining it stated that the RO had concluded that there was no new and material evidence with respect to the claim that had been denied in the December 1985 RO decision and that that RO decision was, therefore, "confirmed". R. at 1099, 1139. Whether or not the RO in 1989 was required to readjudicate the direct-service-connection claim that had been denied in 1985 (*see* 38 C.F.R. § 3.155(c) (1993) (informal claim to reopen previous final decision "will be accepted as a claim")), the RO did expressly confirm its prior decision. Hence, the appellant's July 1989 NOD disagreeing with the RO's denial of service connection (R. at 1102) placed the direct-service-connection issue on appeal to the BVA. This

conclusion is confirmed by the appellant's representative's statement at the January 1990 RO hearing (R. at 1110), the RO Hearing Officer's statement at the conclusion of that hearing (R. at 1122); the Hearing Officer's May 1990 decision (R. at 1128), the BVA's initial, December 1990, decision remanding to the RO for an SSOC (R. at 1133), the RO's January 1991 SSOC (R. at 1137), and the appellant's representative's May 1991 written submission to the Board (R. at 1141)—all described in part I of this opinion and all of which stated either that the claim for service connection was based on the veteran's death due to the induction in him of lymphoma caused by plutonium or radiation exposure in service or that the 1985 RO denial of service connection was confirmed and that no new and material evidence to reopen that claim had been received since that decision. Accordingly, on the facts in this record this Court has jurisdiction over this appellant's contention that the BVA in 1991 was required to address the direct-service-connection claim. We hold no more. Notwithstanding the dire protestations of our dissenting colleague, our jurisdictional holding today is a product of the particular adjudication-process facts of this particular case.

■ *2. New and material evidence:* With the exception of the question of entitlement to service connection on a presumptive basis under section 1112(c), the claim for service connection for lymphoma was previously and finally denied by the RO in December 1985, and may not be reopened or allowed unless "new and material evidence" has been presented or secured with respect to that claim. *See* 38 U.S.C.A. §§ 5108, 7105(c) (West 1991); *Suttmann v. Brown*, 5 Vet.App. 127, 135–36 (1993) (applying to claims finally denied by RO under section 7105(c) the section 5108 provisions for reopening, upon the submission of new and material evidence, claims finally denied by BVA). The Court recently synthesized the applicable law as follows:

"New" evidence is that which is not merely cumulative of other evidence of record. "Material" evidence is that which is relevant to and probative of the issue at hand and which, as this Court stated in *Colvin*

[v. Derwinski, 1 Vet.App. 171, 174 (1991)],
... must be of sufficient weight or significance (assuming its credibility) that there is a reasonable possibility that the new evidence, when viewed in the context of all the evidence, both new and old, would change the outcome.

Cox v. Brown, 5 Vet.App. 95, 98 (1993); see also Justus v. Principi, 3 Vet.App. 510, 513 (1992) (in determining whether evidence is new and material "the credibility of the evidence is to be presumed").

■ The determination as to whether evidence is "new and material" is a question of law subject to de novo review by this Court under 38 U.S.C.A. § 7261(a)(1) (West 1991). See Masors v. Derwinski, 2 Vet.App. 181, 185 (1992); Colvin, supra. In the instant case, however, the BVA failed to address, with reasons or bases, the question, decided adversely by the RO, whether there was new and material evidence presented to reopen the direct-service-connection claim under section 5108. The record does not indicate with any clarity what evidence was before the RO in 1985 and what evidence was received since then. We find nothing in the dissenting opinion to suggest otherwise. For example, it seems likely that the Los Alamos Laboratory exposure estimates were not received by the RO until June 1989 (compare R. at 1090 with R. at 1099), and it seems possible that Dr. Gofman's affidavit, prepared in 1979 for a law suit in federal court, was also not sent to VA until after the 1985 RO decision (see R. at 1125).

Because of the above deficiencies in the Board's analysis, the Court is unable to decide the question of law whether there was new and material evidence to reopen the direct-service-connection claim in this case. See Sammarco v. Derwinski, 1 Vet.App. 111, 113–14 (1991) ("incomplete nature of the decision below does not permit proper review by this Court"). Accordingly, the Court concludes that this issue is not ripe for adjudication by the Court in the first instance. See Bernard v. Brown, 4 Vet.App. 384, 394 (1993); Archer v. Principi, 3 Vet.App. 433, 436 (1992); Branham v. Derwinski, 1 Vet. App. 93, 94 (1990). Remand for that purpose is thus indicated.

3. The effect of Combee: In its December 1985 decision, the RO determined that the claimant was not entitled to "direct" service connection, because lymphoma is not one of the specific "radiogenic diseases" for which direct service connection may be established under 38 C.F.R. § 3.311b (1993) based on in-service ionizing radiation exposure. R. at 1090. In the absence of any evidence that the veteran died from a disease listed as "radiogenic" in § 3.311b, there is no basis upon which direct service connection could be established under that provision. However, if there is new and material evidence associating the veteran's radiation exposure with the development of his lymphoma, then there would be a basis upon which direct service connection could be established under the provisions of section 1110 and § 3.303(d) unless this Court's decision in Combee v. Principi, 4 Vet.App. 78 (1993), or 38 C.F.R. § 3.311b(h) has precluded that result.

In Combee, which was decided subsequent to the BVA decision here on appeal, the Court stated:

[A] veteran may not establish direct service connection, based solely on radiation exposure, if the veteran's disability is not one of the enumerated 'radiogenic diseases' under 38 C.F.R. § 3.311b(b)(2), and ... the provisions of 38 C.F.R. §§ 3.303(d), 3.311b(h) do not afford an alternative basis for establishing direct service connection for a disease on the basis that the disease is the product of exposure to ionizing radiation.

Combee, 4 Vet.App. at 94.

■ In her supplemental brief and argument before this Court, the appellant asserts that the Combee holding applies only to claims in which the veteran's radiation exposure was the result of participation in atmospheric nuclear testing or the occupation by U.S. Forces of Hiroshima or Nagasaki, Japan, following the nuclear detonations there in 1945, and does not apply to claims, such as in the instant case, based upon other sources of in-service radiation exposure. The basis for this argument is that the Veterans' Dioxin and Radiation Exposure Compensation Standards Act, Pub.L. No. 98–542, 98 Stat.

2725 (1984) (1984 Act), "pursuant to which 38 C.F.R. § 3.311b was implemented" (*Combee*, 4 Vet.App. at 93), had specified in section 5(a)(1)(B) that the Act pertained to claims of exposure of veterans to ionizing radiation from two sources—"the veteran's participation in atmospheric nuclear tests or . . . the American occupation of Hiroshima or Nagasaki, Japan, prior to July 1, 1946"—and that the Secretary was thus without authority under the 1984 Act or any other statute to provide in § 3.311b an exclusive process for establishing direct service connection for claims based upon other sources of radiation exposure, as in the instant case. *See* Supp. Br. at 11, 15–17 (citing *Combee v. Brown*, 5 Vet.App. 248, 256–57 (1993) (Kramer and Steinberg, JJ., dissenting from order denying en banc review)). The appellant asserts that because the appellant in *Combee* had been exposed to one of the sources of ionizing radiation specified in the 1984 Act the *Combee* opinion did not address specifically the question whether the exclusive § 3.311b adjudication process could lawfully be applied to a veteran whose radiation exposure was not from one of those specified sources and that, therefore, the *Combee* opinion is not controlling in this case. Supp.Br. at 15–17 (citing *United States v. Crawley*, 837 F.2d 291, 292 (7th Cir.1988) (court held that statements it had made in prior case were dicta and therefore not controlling in subsequent case)).

On the other hand, the Secretary contended in his supplemental brief and at oral argument that the Court is bound by the above-quoted statement in *Combee*, on the ground that it applies, by its terms, to claims based on any source of radiation exposure; that the factual distinctions between *Combee* and the instant case are irrelevant for purposes of the application of the *Combee* language; and that to the extent that the provisions of § 3.311b(a)(2)(iii) may exceed the scope of the 1984 Act, those regulatory provisions are nevertheless authorized under the Secretary's general regulation-writing authority under 38 U.S.C.A. § 501(a) (West 1991).

The Court holds that a decision on this issue is not necessary to a disposition of this appeal at this point because the question of service connection based on a direct-service-connection theory under 38 C.F.R. § 3.303(d) is presented only if there was new and material evidence to reopen the 1985 BVA decision and that latter issue is not being decided by the Court in this opinion. The *Combee* issue, therefore, is not yet ripe for adjudication by the Court. *See Bernard, supra; Archer, supra; Branham, supra.*

However, the Court notes the following regarding the viability of a direct-service-connection claim under the circumstances of this case. The language quoted above from the *Combee* opinion, although universal in scope, does not constitute binding precedent beyond the facts there before the Court. (The same is, of course, true about what the Court here notes about this matter.) "It is of course contrary to all traditions of our jurisprudence to consider the law on this point conclusively resolved by broad language in cases where the issue was not presented or even envisioned." *R.A.V. v. St. Paul,* —— U.S. ——, —— n. 5, 112 S.Ct. 2538, 2545 n. 5, 120 L.Ed.2d 305 (1992). *See also Adams v. Texas,* 448 U.S. 38, 45 n. 3, 100 S.Ct. 2521, 2526 n. 3, 65 L.Ed.2d 581 (1980) ("we do not treat the question as foreclosed [by a prior opinion], however, because the issue was not explicitly raised in that case"); *Zenith Radio Corp. v. United States,* 437 U.S. 443, 462, 98 S.Ct. 2441, 2451, 57 L.Ed.2d 337 (1978) (quoting *Cohens v. Virginia,* 19 U.S. (6 Wheat) 264, 399, 5 L.Ed. 257 (1821), where the Court stated: "It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented for decision."); *Wright v. United States,* 302 U.S. 583, 593, 58 S.Ct. 395, 399, 82 L.Ed. 439 (1938) (same); *Osaka Shosen Kaisha Line v. United States,* 300 U.S. 98, 57 S.Ct. 356, 81 L.Ed. 532 (1937) (same). "The language of an opinion is not always to be parsed as though we were dealing with a statute". *CBS, Inc. v. FCC,* 453 U.S. 367, 385–86, 101 S.Ct. 2813, 2824–25, 69 L.Ed.2d 706 (1981). The Court of Appeals for the Federal Circuit

recently stated: "[I]t is well established that a general expression in an opinion, which expression is not essential to the disposition of the case, does not control a judgment in a subsequent proceeding. Broad language in an opinion, which language is unnecessary to the Court's decision, cannot be considered binding authority." *Smith v. Orr*, 855 F.2d 1544, 1550 (Fed.Cir.1988) (citing *Cohens* ). *See also Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 708 n. 8 (Fed.Cir.1992) (quoting *Cohens* ).

Section 5(a)(1)(B) of the 1984 Act directed the then Administrator of Veterans' Affairs (now the Secretary) to establish guidelines for adjudicating claims based on radiation exposure resulting from the "veteran's participation in atmospheric nuclear tests or . . . the American occupation of Hiroshima or Nagasaki, Japan, prior to July 1, 1946". Pub.L. No. 98–542, § 5(a)(1)(B), 98 Stat. at 2727. However, § 3.311b, which VA prescribed in 1985 to carry out the 1984 Act, expressly establishes an adjudication process applicable to claims based on both of those types of exposure *as well as* to "all other claims involving radiation exposure". 38 C.F.R. § 3.311b(a)(2)(iii) (1993). The Department has inexplicably described the regulatory provision as to "all other [radiation] claims" as having been "adopted by VA under the authority of [the 1984 Act]". S.Rep. No. 139, 102d Cong., 1st Sess. 30 (1991), *reprinted in* 1992 U.S.C.C.A.N. 4057, 4084 (June 12, 1991, testimony of VA Deputy Secretary).

However, neither the 1984 Act nor any other law provided express authority for VA's establishment of special regulatory procedures for adjudicating claims based on a source of exposure to radiation other than participation in atmospheric nuclear testing or participation in the occupation of Hiroshima or Nagasaki. Moreover, there is no indication anywhere in the 1984 Act's legislative history that it was intended to be applicable to any other sources of exposure. *See* H.R.Rep. No. 98–592, 98th Cong., 2d Sess. (1984) (to accompany H.R.1961), *reprinted in* 1984 U.S.C.C.A.N. 4449; 1984 U.S.C.C.A.N. 4470 (joint explanatory statement of House and Senate Veterans' Affairs Committees);

130 Cong.Rec. S29941–65 (Oct. 4, 1984) (Senate debate on H.R.1961); 130 Cong.Rec. S13147–81 (May 22, 1984) (debate on S. 1651); 130 Cong.Rec. H29544–57 (Oct. 3, 1984) (debate on H.R.1961); 130 Cong.Rec. H736–52 (Jan. 30, 1984) (same). Indeed, Congress in 1992, for the first time, specifically addressed the 1984 Act's possible applicability to such other types of in-service exposure. (Section 3 of the 1992 Act added to the 1984 Act a new section 10 requiring the Advisory Committee on Environmental Hazards (established by the 1984 Act), pursuant to review of scientific studies, to prepare a report to the Secretary concerning the feasibility and appropriateness of further investigation

> to determine whether activities (other than the tests or occupation activities referred to in section 5(a)(1)(B) [of the 1984 Act] ) resulted in the exposure of veterans to ionizing radiation during the service of such veterans that occurred before January 1, 1970, and whether adverse health effects have been observed or may have resulted from such exposure in a significant number of such veterans. . . .

Veterans' Radiation Exposure Amendments of 1992, Pub.L. No. 102–578, § 3, 106 Stat. 4774, 4774–75.) In the absence of any specific legislative intent to apply the 1984 Act's special adjudicative process to claims based on these other sources of exposure, any VA regulations establishing a process—let alone *the* process—for adjudication of "all other claims based on radiation exposure" must be "consistent with" the general statutory claims-adjudication provisions in title 38, U.S.Code 38 U.S.C.A. § 501(a) (West 1991) (VA has authority to prescribe regulations that are "consistent with" the laws administered by VA).

■ Those general claims-adjudication provisions are set forth in Code sections 1110 and 1154(a). They provide entitlement to service-connected disability compensation generally to a veteran who can demonstrate that his or her "injury or disease" was incurred or aggravated during active service (section 1110) and that "in each case" of a veteran seeking service-connected disability compensation, "consideration shall be given

to the places, types, and circumstances of such veteran's service" (section 1154). 38 U.S.C.A. §§ 1110, 1154 (West 1991). Many general VA regulations, prescribed pursuant to 38 U.S.C.A. §§ 1110 and 1154(a) and other authority, are similarly oriented toward individualized claims-adjudication. Examples are VA regulations which provide that VA "administer[s] the law under a broad and liberal interpretation consistent with the facts of each individual case" (38 C.F.R. § 3.303(a) (1993)) and must "grant every benefit that can be supported by law while protecting the interests of the government" (38 C.F.R. § 3.103(a) (1993)).

Making the § 3.311b adjudication process applicable to such "other claims based on radiation exposure" would, in our view, be "consistent with" those general VA claims-adjudication statutory provisions only so long as a claimant still had recourse to VA's basic claims process if the § 3.311b process proved unavailing in a particular case. Accordingly, as to such other radiation claims, the provisions of § 3.311b cannot, on our analysis, be properly viewed either as prescribed "pursuant to" the 1984 Act, or as establishing for such claims an exclusive adjudication process that would deny to a VA claimant the opportunity to prove independently, by producing medical and scientific evidence, his or her claim based on such "other" radiation exposure. Therefore, applying the Secretary's interpretation that § 3.311b established an *exclusive* process for adjudicating claims based on sources of radiation exposure other than those specified in section 5 of the 1984 Act would, in our view, surely not be consistent with U.S.Code sections 1110 and 1154(a).

In summary, our position is that the *Combee* case was one of statutory construction, and that the 1984 Act (Public Law 98–542) defines very carefully the categories of radiation-exposure sources to which it applied (*see* 38 C.F.R. § 3.311b(a)(2)(i) and (ii)); that the exposure of the veteran here did not fit into either of the prescribed categories; and that the 1984 Act, therefore, did not apply to him. To the extent that the Secretary's § 3.311b regulations are interpreted by VA to apply the 1984 Act's adjudication process as the *exclusive* one for claims not falling within

the Act's two specified categories—that is, to the extent that § 3.311b(h) may be construed to apply the 1984 Act's claims-adjudication process to the "other" exposure claims category in § 3.311b(a)(2)(iii) even though the 1984 Act did not apply to such other claims— those regulations are, in our view, in excess of the Secretary's authority, for the reasons set forth above, and cannot lawfully prohibit the reopening in this case of a claim for direct service connection if there is new and material evidence as to that claim.

■ Finally, we note that subsequent to the BVA decision in this case, the Secretary has issued a revised regulation to codify his interpretation of the § 3.311b regulations as calling for the Secretary to prescribe an exclusive list of those diseases which may be adjudicated as service connected based on any source of in-service exposure to ionizing radiation. In 58 Fed.Reg. 16358 (Mar. 26, 1993), VA amended 38 C.F.R. § 3.311b(h) to provide, effective March 26, 1993, that "service connection will not be established under this section, or any other section except for [38 C.F.R.] §§ 3.309(d) [15 diseases presumed to be service connected] ..., *on the basis of exposure to ionizing radiation* and the subsequent development of any disease not specified in paragraph (b)(2) of this section" (emphasis added). Under the Court's opinion in *Karnas v. Derwinski,* 1 Vet.App. 308, 313 (1991), VA's new regulation in paragraph (h) of § 3.311b is not applicable to appellant's situation because it is less "favorable" to her than the prior regulation and VA has not provided that the regulation should have retroactive effect. *See* 58 Fed.Reg. 16358 (Mar. 26, 1993) (providing that the regulation would be effective as of March 26, 1993, the date of its promulgation). For the reasons set forth above, it is our view that this new paragraph (h) codifying VA's exclusivity interpretation is, *a fortiori,* similarly defective as to those "other" claims described in § 3.311b(a)(2)(iii).

### C. Clear-and-Unmistakable Error

In her brief and supplemental brief before this Court, the appellant has raised the issue of "clear and unmistakable error" (CUE) in the December 1985 RO decision, requiring

revision of that decision under 38 C.F.R. § 3.105(a) (1993). *See Russell v. Principi*, 3 Vet.App. 310, 313–15 (1992) (en banc). Because this claim was not raised to or adjudicated by the BVA, the Court lacks jurisdiction to review it. *Id.* at 315 ("The necessary jurisdictional 'hook' for this Court to act is a decision of the BVA on the specific issue of 'clear and unmistakable error.'"). Although the May 1990 Hearing Officer's decision and the January 1991 SSOC both refer to "clear and unmistakable error" in discussing the finality of the December 1985 RO decision, no specific claim of CUE had been raised to the RO or Board and the references to CUE in those two documents do not constitute adjudications of any such claim. *See Fugo v. Brown*, 6 Vet.App. 40, 44 (1993) ("there must be some degree of specificity as to what the alleged error is and, unless it is the kind of error, as in *Mata [v. Principi*, 3 Vet.App. 558 (1992) ], that, if true, would be CUE on its face, persuasive reasons must be given as to why the result would have been *manifestly* different but for the alleged error" (emphasis in original)). The appellant is free to file a claim for revision of the 1985 RO decision on the basis of CUE.

### III. Conclusion

Based upon the foregoing analysis, the June 28, 1991, BVA decision is affirmed insofar as it denied entitlement to service connection for lymphoma on a presumptive basis under 38 U.S.C.A. § 1112(c). However, the matter is remanded to the Board for it to address, consistent with part II.B.2. of this opinion, whether the appellant has submitted new and material evidence; if so, whether a direct-service-connection claim may be raised under 38 C.F.R. § 3.303(d), notwithstanding 38 C.F.R. § 3.311b(a)(2)(iii), (h); and, if so, whether the claim should be granted. "On remand, the appellant will be free to submit additional evidence and argument" with respect to the remanded matter. *Quarles v. Derwinski*, 3 Vet.App. 129, 141 (1992). The Court retains jurisdiction. The Secretary shall file with the Clerk (as well as serve upon the appellant) a copy of any Board decision on remand. Within 14 days after the filing of any such final decision, the appellant shall notify the Clerk whether she desires to seek further review by the Court.

**AFFIRMED IN PART; REMANDED IN PART.**

IVERS, Judge, concurring in part and dissenting in part:

I write to concur in the Court's opinion in parts II.A. and II.C., but to dissent from the Court's opinion in part II.B.1, 2, and 3. Having resolved the *only* issue before the Court—service connection under 38 U.S.C.A. § 1112(c) (West 1991), the majority's opinion should have ended at that point. *Ante* at 146–47. Instead, the majority proceeds down a separate and unnecessary path by opining as to the applicability of *Combee v. Principi*, 4 Vet.App. 78, *denying motion for review sub nom., Combee v. Brown*, 5 Vet. App. 248 (1993) (en banc), and a regulation recently promulgated by the Secretary, 38 C.F.R. § 3.311b(h) (1993). *Ante* at 149–52. From that point forward, the opinion contains nothing but dicta, and those dicta consist entirely of the continued musings of the two judges of this Court who dissented from the Court's order denying en banc review of *Combee*. In that part of the opinion from which I dissent, the majority goes to great lengths to achieve a result we all might like to see; however, the majority has failed to take into account the full effect on this case of the holding in *Spencer v. Brown*, 4 Vet. App. 283 (1993). In so doing, the majority creates the sort of "stew" that Justice Frankfurter cautioned against in *Bisso v. Inland Waterways Corp.*, 349 U.S. 85, 100, 75 S.Ct. 629, 637, 99 L.Ed. 911 (1955), where he stated, "A stew may be a delicious dish. But a stew is not to be made in law by throwing together indiscriminately decision and dicta...." The majority opinion unnecessarily decides whether *Combee* and 38 C.F.R. § 3.311b(h) are applicable to the facts of this case. Couching this part of the decision in the guise of dicta, *ante* at 149–52, the majority attempts to avoid the perception that it is reaching for a particular result in a case that is not suited to such a result. While the majority may well be correct in its dicta, insofar as it emphasizes the fact that the language used in deciding *Combee* **may** be overly broad, this Court, like all courts, will have ample opportunity to deal with the issue

when an appropriate case is presented to it. This is not that case. Having failed in *Combee* to attract any support for their minority view through reason, the proponents here try to establish that view by force as "dicta" in the majority opinion of a panel. *See id.*, 5 Vet.App. at 248 (Kramer and Steinberg, JJ., dissenting from the per curiam order denying en banc review).

The danger of these dicta is that, although theoretically and technically not binding, practically, they give the appearance of carrying the cloak of judicial acceptance. As one scholar has stated, "Much depends on the character of the dictum. Mere obiter may be entitled to little weight, while a carefully considered statement ..., though technically dictum, must carry great weight, and may even ... be regarded as conclusive." CHARLES A. WRIGHT, THE LAW OF FEDERAL COURTS § 58, at 374 (4th ed. 1983); *see also McCoy v. Massachusetts Institute of Technology*, 950 F.2d 13, 19 (1st Cir.1991) (giving effect to considered dictum of the Supreme Court). The majority should heed its own cautions and not make overly broad pronouncements that are neither warranted by the facts of this specific case nor supported by a majority of the full Court. *See ante* at 149 (citing and quoting *Zenith Radio Corp. v. United States*, 437 U.S. 443, 462, 98 S.Ct. 2441, 2451, 57 L.Ed.2d 337 (1978); *Wright v. United States*, 302 U.S. 583, 593, 58 S.Ct. 395, 399, 82 L.Ed. 439 (1938); *Osaka Shosen Kaisha Line v. United States*, 300 U.S. 98, 57 S.Ct. 356, 81 L.Ed. 532 (1937); *Cohens v. Virginia*, 19 U.S. (6 Wheat) 264, 399, 5 L.Ed. 257 (1821); *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 708 n. 8 (Fed.Cir.1992); *Smith v. Orr*, 855 F.2d 1544, 1550 (Fed.Cir. 1988)). Through its dicta, the majority seeks to dictate the result of any remand to the Board.

This case was before the Board *solely* for the limited purpose of applying a possibly liberalizing statutory provision, 38 U.S.C.A. § 1112(c) (West 1991), to this particular set of facts. The majority holds that the liberalizing law does not apply to this particular set of facts. *Ante* at 146–47. That, in my opinion, should be the end of the matter. To go

any further simply flies in the face of *Spencer;* the attempt to get around these issues by manufacturing a reopened claim for direct service connection relies on a dangerously thin strand of suppositions culminating in a finding that appellant *may* have submitted new and material evidence. The issue of direct service connection was finally decided in 1985 and neither the claimant, the Board, nor this Court, despite the valiant efforts of the majority, can manufacture valid evidence or procedure from this record which would give rise to a reopening.

Having previously decided the issue of direct service connection, the Secretary could not reopen the claim absent new and material evidence pertaining to that claim. The Court recently reprised the longstanding case law regarding reopening of claims:

> Under 38 U.S.C.A. § 7104(b) (West 1991), a final decision by the BVA on a given claim "may not thereafter be reopened and allowed and a claim based upon the same factual basis may not be considered." One exception to the § 7104(b) rule is 38 U.S.C.A. § 5108 (West 1991) which states, "If new and material evidence is presented or secured with respect to a claim which has been disallowed, the Secretary shall reopen the claim and review the former disposition of the claim."

*Moray v. Brown*, 5 Vet.App. 211, 213 (1993). *See also Colvin v. Derwinski*, 1 Vet.App. 171, 174 (1991).

The majority opinion gives short shrift to the fact that in 1989, the RO, *acting on its own initiative,* revisited appellant's claim for dependency and indemnity compensation for a very narrow and limited purpose, i.e., entitlement to service connection for the cause of the veteran's death under a newly enacted law, the Radiation–Exposed Veterans Compensation Act of 1988, Pub.L. No. 100–321, 102 Stat. 485 (1988) (currently codified at 38 U.S.C.A. § 1112(c) (West 1991)). In *Spencer,* the Court explained very clearly when a previously and finally denied claim may be reviewed based upon an intervening change in a law or regulation.

> The entitlement to de novo review of a previously and finally denied claim based upon an intervening change in law or regu-

lation creating a new entitlement *derives from the new law or regulation itself.* When a provision of law or regulation creates a new basis of entitlement to benefits, as through liberalization of the requirements for entitlement to a benefit, an applicant's claim of entitlement under such law or regulation is *a claim separate and distinct from a claim previously and finally denied prior to the liberalizing law or regulation.* The applicant's latter claim, asserting rights which did not exist at the time of the prior claim, is necessarily a different claim. *See, e.g., Sawyer v. Derwinski,* 1 Vet.App. 130, 133 (1991). Section 7104(b) provides that "when a claim is disallowed by the Board, the claim may not thereafter be reopened and allowed and a claim based upon the same factual basis may not be considered." *Where a claim is based upon a substantive right created by a statutory or regulatory provision that did not exist at the time of the prior final denial of the claim, adjudication of the latter claim is not a "reopening" of the first, such as would be prohibited, absent new and material evidence, by section 7104(b).*

*Spencer,* 4 Vet.App. at 288–89 (emphasis added). Although the Court in *Spencer* did not find the statute in question there to be a liberalizing law, the Court made clear that a liberalizing law may create a *new* claim for benefits. *Ibid.* Because the claim at issue in the instant case was founded solely on a "new basis of entitlement to a benefit," it was a separate and distinct claim from the previously adjudicated claims. The *Spencer* Court reasoned that "the fact of the intervening change in law is itself sufficient to change the factual basis such that the latter claim is not 'a claim based upon the same factual basis' as the former claim." *Id.* at 289. The direct consequence of this reasoning is that a possibly liberalizing law or intervening change in the law creates a basis for a new, separate, distinct claim, and not for a reopened claim, since the factual basis of the previously decided claim has not changed at all.

The majority points to the RO's June 1989 Deferred or Confirmed Rating Decision sheet, appellant's July 1989 Notice of Dis-

agreement (NOD), appellant's representative's statements at the January 1990 personal hearing, the RO Hearing Officer's May 1990 decision, the BVA's December 1990 remand for the issuance of a Supplemental Statement of the Case (SSOC), the January 1991 SSOC, and appellant's representative's May 1991 letter to the Board for the proposition that the RO, the Board, and appellant all framed the issue as a resubmitted claim for direct service connection under 38 C.F.R. §§ 3.309(d) and 3.311b. *Ante* at 147. The majority's labored characterization of the various steps in the RO's and the BVA's adjudication as encompassing a resubmitted claim is erroneous. The references therein to the lack of new and material evidence to reopen the direct service connection claim underscore the fact that the RO undertook a review of the circumstances of the veteran's death only for the purposes of a determination of entitlement to service connection under the Radiation–Exposed Veterans Compensation Act of 1988, codified at 38 U.S.C.A. § 1112(c), and not because there was an issue involving newly submitted evidence pertaining to the previously denied direct service connection claim.

In addition, the majority's characterization of testimony at a January 1990 hearing by appellant's service representative as a claim to reopen, *ante* at 147, is not correct. Although the service representative contended that the veteran's lymphoma "was caused by the plutonium or radiation exposure causing his death," R. at 1110, it is clear from the context of the hearing that the representative was trying to establish that the veteran was a "radiation-exposed veteran" within the meaning of 38 U.S.C.A. § 1112(c) and not to reopen the previously decided claims. At no point during the hearing did appellant or her service representative mention the prior denial or seek to reopen the prior denial. The context of this proceeding was a review of the circumstances of the veteran's death for a determination of eligibility under 38 U.S.C.A. § 1112(c). To read a claim to reopen a previously denied claim into this context would impose a duty upon the Secretary to resurrect and decide issues that were never intended by Congress to be thrust upon

the VA in the Radiation–Exposed Veterans Compensation Act of 1988. The majority could certainly not find such a duty in the legislative history of the Act as there is no such support in that history for such a finding.

The majority neglects to consider not only that appellant's case was reopened for a narrow, limited purpose—i.e., a determination of eligibility under 38 U.S.C.A. § 1112(c)—but also that the July 1989 NOD predated any hint that appellant *may* have been seeking to reopen the claim for direct service connection under 38 C.F.R. §§ 3.303(d) or 3.311b. Therefore, appellant could not have disagreed with an issue that was not raised until the January 1990 hearing—and it is apparent, as discussed above, that a claim to reopen was not raised even in the January 1990 hearing. By analogy to *Hamilton v. Brown,* 4 Vet.App. 528 (1993) (en banc), there the Court held:

> [W]here the BVA remands to an RO for development and adjudication a claim not decided by the RO (*and as to which no NOD has ever been filed, and which thus is not an appealed claim* ) and the claimant files a timely expression of disagreement with the RO, that expression is an NOD as to that claim, which then becomes an appealed claim, even though the BVA may also have remanded to the RO concurrently a claim which *had* been previously decided by the RO, as to which a prior NOD had been timely filed, and which thus was already an appealed claim.

*Id.* at 538–39 (boldface italics added). Although this holding in *Hamilton* certainly involved a remand by the BVA, the analysis is the same: where other issues are raised subsequent to an RO's adjudication and an NOD filed thereupon, the NOD with respect to those issues is not the same as the NOD that commenced the appeal. Where *Hamilton* gave some clarity, the majority here, by implication, takes that away.

Regardless of the majority opinion's characterization of the RO's adjudication or appellant's and her representative's statements and testimony as referring to a resubmitted claim, the majority ignores the indisputable jurisdictional impact of a previously and finally denied claim. As this Court articulated in *McGinnis v. Brown,* 4 Vet.App. 239, 244 (1993),

> jurisdiction does indeed matter and it is not "harmless" when the VA during the claims adjudication process fails to address threshold jurisdictional issues. This is particularly true when the Secretary ignores the mandates of 38 U.S.C.A. §§ 7104(b) and 7105(c) (West 1991) which provide that finally denied claims cannot be reopened without the submission of "new and material evidence". . . .

Here, the parties have pointed out what evidence may or may not have been newly submitted to the VA after the 1985 RO decision. At oral argument, counsel for the Secretary stated that only a one-page resume of the veteran's career and testimony proffered at the January 1990 personal hearing were newly submitted. Counsel for appellant indicated that the newly submitted evidence could possibly have consisted of exposure records from Los Alamos. The personal hearing testimony was cumulative of appellant's previously submitted contentions regarding the cause of the veteran's malignant lymphoma. The Los Alamos laboratory exposure estimates were submitted on the issue of whether the veteran qualified as a "radiation-exposed veteran" under 38 U.S.C.A. § 1112(c), the recently enacted law. None of this evidence is new and material to a claim for direct service connection given the context in which it was submitted: the veteran's exposure to ionizing radiation and participation in radiation-risk activity, as defined under section 1112(c)(4) (West 1991).

The majority also quotes at length from an *August 1979* affidavit from Dr. John Gofman as *possibly* having been submitted subsequent to the RO's 1985 decision. *Ante* at 144–45. This document clearly *predated* chronologically the RO's 1985 decision. The majority states that no document of record associated with the RO's 1985 decision refers to this affidavit. *Ante* at 145. However, the majority points to a September 1989 VA Form 1–9 (Appeal to the BVA), which appealed the RO's 1989 denial on the basis of "data available in files available to the government, and in files held by attorney Alan

Einhorn.... Mr. Einhorn is transferring information from his files to ... my representative from the Jewish War Veterans." *Ibid.* (quoting R. at 1125). This statement is equivocal at best since it refers to data already available to the government. Nevertheless, even if the August 1979 affidavit were submitted subsequent to the RO's 1985 decision, the affidavit is not sufficient to reopen the claim for direct service connection. In *Tirpak v. Derwinski*, 2 Vet.App. 609, 611 (1992), the Court held that a claim was not well grounded where the only evidence in support of that claim was a physician's statement that a "veteran's death *may or may not* have been averted." *See also Gobber v. Derwinski*, 2 Vet.App. 470, 472 (1992) (" 'New and material evidence' is, by its nature, well-grounded, i.e., evidence that, if believed, would provide a 'reasonable possibility' that the outcome would be changed."). Similarly, the affidavit in question here discusses a link between ionizing radiation and lymphoma but does not indicate that this veteran's lymphoma was indeed caused by in-service exposure to ionizing radiation. Although the majority opinion quotes at length from the 1979 affidavit, *ante* at 144–45, it does not adequately assess the most telling part of that affidavit, which stated: "The estimation of the risk of lymphoma induction from plutonium exposure in Mr. Lasovick *will become possible through resolution of the quantity taken in, through the process of discovery and possibly through tissue analysis.*" R. at 1064 (emphasis added). Thus, having discussed the risk that ionizing radiation may cause lymphoma and other cancers, Dr. Gofman, in effect, stated that he did not know the risk of induction of lymphoma for the veteran.

On the basis of the record, the Court can make a determination as to the newness and materiality of the evidence without manipulating the record to arrive at a conclusion that some evidence predating the 1985 RO decision *may* have been submitted subsequent to that decision.

The majority opinion goes even further. In examining the applicability or inapplicability of *Combee*, the majority essentially decides a case that is not yet, and might never

be—at least as far as this particular case is concerned—at issue before the Court. Under 38 U.S.C.A. § 7252(a) (West 1991), "[t]he Court of Veterans Appeals shall have exclusive jurisdiction to review decisions of the Board of Veterans' Appeals." Here, there is no decision regarding a resubmitted claim for direct service connection; there is only a claim, raised sua sponte by the VA, for presumptive service connection under the then newly enacted 38 U.S.C.A. § 1112(c). For the majority to delve into the substantive law regarding a resubmitted claim for direct service connection at this juncture, in effect creates and then decides an issue without benefit of the normal process whereby issues are raised and decided below and the results are then advanced by the parties for review in this Court.

Here, the majority's remand to the BVA for a determination of whether new and material evidence was submitted to reopen the claim for direct service connection would result in "an ongoing agency proceeding," meaning that the agency has not yet completed its decisionmaking process. For the Court to opine on the applicability of *Combee* at this point is altogether premature. By analogy to the Administrative Procedure Act, 5 U.S.C.A. § 701 *et seq.* (West 1977), which provides for judicial review of "final agency action for which there is no other adequate remedy in a court," *id.* at § 704, a reviewing court charged with determining when an agency action is final looks to whether the action's "impact 'is sufficiently direct and immediate' and has a 'direct effect on ... day-to-day business.' " *Franklin v. Massachusetts*, — U.S. —, —, 112 S.Ct. 2767, 2773, 120 L.Ed.2d 636 (1992) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 152, 87 S.Ct. 1507, 1517, 18 L.Ed.2d 681 (1967)). "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Franklin*, — U.S. at —, 112 S.Ct. at 2773; *see also Molins PLC v. Quigg*, 837 F.2d 1064, 1067 (Fed.Cir.1988) (in resolving issue of fitness for judicial review, court must determine if challenged action raises purely legal questions, which renders action presumptively fit for review *"unless* the courts or agency

would benefit from postponement of review until the agency's policy has crystallized or the question arises in a more concrete setting") (emphasis added); *Public Citizen Health Research Group v. Commissioner, Food & Drug Administration*, 740 F.2d 21, 30 (D.C.Cir.1984) (although Supreme Court has instructed courts to apply finality and ripeness doctrines flexibly, "[e]ven this flexibility will not usually suffice ... to permit judicial resolution of substantive issues that are the subject of an ongoing agency proceeding."); *see generally State Farm Mut. Auto Ins. Co. v. Dole*, 802 F.2d 474, 479 (D.C.Cir.1986) (in discussing ripeness doctrine, Court of Appeals for the District of Columbia Circuit noted that "courts and agencies have a legitimate interest in avoiding adjudication of speculative controversies."). The affirmance of the Board's denial of service connection under 38 U.S.C.A. § 1112(c) is the end of the inquiry, and there is no reason to go any further. Even if there were a question about what evidence, if any, was submitted subsequent to the 1985 RO decision, the majority could have simply ended by remanding to the Board for a determination of whether any evidence was submitted after 1985. Clearly, the newness and materiality of evidence, if any was in fact submitted after the 1985 RO decision, is an issue that the VA and the BVA have never been called upon to address. As previously discussed, the majority goes far beyond this remedy by attacking *Combee* and attempting to further influence the result of the remand.

Whether or not *Combee* is applicable to the facts of this case, the majority's cavalier treatment of the substantive holdings of *Spencer* and *Hamilton*, in essence, overrules them. It is not appropriate for a panel to do so. *See Bethea v. Derwinski*, 2 Vet.App. 252, 254 (1992); *see also Tobler v. Derwinski*, 2 Vet.App. 8, 14 (1991) ("[A] decision of this Court, unless or until overturned by this Court *en banc*, the United States Court of Appeals for the Federal Circuit, or the Supreme Court, is a decision of the Court on the date it is issued; any rulings, interpretations, or conclusions of law contained in such a decision are authoritative and binding ..."); *see, e.g., Butts v. Brown*, 5 Vet.App. 532, 540 (1993) (en banc) (overruling in part, inter alia, *McGrath v. Brown*, 5 Vet.App. 57 (1993), and *Horowitz v. Brown*, 5 Vet.App. 217 (1993)); *but see Dupont Circle Citizens Ass'n v. D.C. Board of Zoning Adjustment*, 403 A.2d 314, 318 (D.C.1979) (panel of the District of Columbia Court of Appeals overturned prior decision without resorting to formal en banc procedure where no member of the Court had requested formal en banc consideration and had not objected to Court's holding).

The case before the RO was strictly limited to appellant's eligibility under the recently enacted and codified 38 U.S.C.A. § 1112(c). The majority now imposes a duty on the Secretary to adjudicate issues which have been previously reviewed and which are beyond the scope of a new entitlement when an RO or the Board reviews de novo a claim on the basis of a liberalizing law or regulation. In the Radiation–Exposed Veterans Compensation Act of 1988, Congress did not direct the Secretary to seek out all possible claimants and to adjudicate de novo any such claims. *Cf. Mason v. Derwinski*, 2 Vet.App. 487, 488 (1992) (voluntary department-wide review of World War II and Korean War veterans' claims did not obligate Secretary to award effective date as of the date the review began). The majority, in effect, penalizes the Secretary for having conducted a de novo review of appellant's claim in light of a possibly liberalizing, newly enacted statute. What effect this will have on the Secretary's initiative in identifying and adjudicating claims based on new entitlements remains to be seen. Again, I dissent.